**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| | ) | |
| FEDERAL ENERGY | ) | |
| REGULATORY COMMISSION, | ) | Case No. |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD SILKMAN, | ) | |
| COMPETITIVE ENERGY | ) | |
| SERVICES, LLC, | ) | **JURY TRIAL REQUESTED** |
| | ) | |
| Respondents. | ) | |
| | ) | |

**PETITION FOR AN ORDER AFFIRMING THE FEDERAL ENERGY REGULATORY**
**COMMISSION'S AUGUST 29, 2013 ORDERS ASSESSING CIVIL PENALTIES**
**AGAINST RICHARD SILKMAN AND**
**COMPETITIVE ENERGY SERVICES, LLC**

Petitioner Federal Energy Regulatory Commission ("FERC" or "Commission"), pursuant

to section 31(d) of the Federal Power Act ("FPA"), 16 U.S.C. § 823b (2012), petitions this Court

for an Order Affirming the Commission's August 29, 2013 Orders Assessing Civil Penalties

("Orders Assessing Civil Penalties") against Richard Silkman ("Silkman") and Competitive

Energy Services, LLC ("CES").

**SUMMARY OF THE ACTION**

1.      This is an action for judicial review of civil penalties assessed by the Commission

against Silkman and CES for engaging in a fraudulent scheme to manipulate the ISO New

England, Inc. ("ISO-NE") Day-Ahead Load Response Program ("DALRP") from July 2007 to

February 2008.

2.      ISO-NE is an independent, non-profit, Regional Transmission Organization serving Massachusetts, Connecticut, Maine, New Hampshire, Rhode Island, and Vermont. ISO-NE ensures the day-to-day reliable operation of New England's bulk electric energy generation and transmission system by overseeing and ensuring the fair administration of the region's wholesale electricity markets.  The Commission regulates the markets administered by ISO-NE.

3.      ISO-NE administers load response programs that encourage large electricity users to reduce their electricity consumption or "load" during periods of high or peak demand on the bulk electric system.  This reduction in consumption helps ease stress on the electric grid and also can help lower electricity prices.  Load response programs are a form of "demand response," whereby consumers of electric energy intentionally offer to temporarily reduce their use of or "demand" for electricity.

4.      The specific demand response program at issue here is ISO-NE's DALRP, which allowed participants to offer electricity reductions for hours in the next day when New England experienced high electricity prices.  Under this program, participants who offered to reduce their electric load the following day – *and then actually reduced their consumption of electricity* – were paid for the value of the electricity they conserved.

5.      Participants in the program were allowed to reduce their electric energy consumption any way they chose, as long as they actually reduced their electricity usage.  For example, if a factory normally ran three production lines, it could choose to temporarily run only two production lines, thereby reducing its use of electricity.  In such a situation, the DALRP would pay the factory for the electricity savings resulting from its shuttering of the third line.

6.       To participate in the DALRP, a company first had to authorize ISO-NE to measure its electricity consumption from the grid in order to create a baseline that represented the company's normal electricity usage before offering to reduce consumption.  The only way for ISO-NE to calculate how much electricity a participant conserved – and how much money they should be paid for these electricity savings – was to understand how much electricity the participant normally used when it was not offering to provide demand response by reducing electricity consumption.  That is, ISO-NE would need to compare a participant's reduced electricity usage against the baseline established before participating in the program to determine whether, and how much, that participant actually reduced its consumption and, thus, how much DALRP money the participant was entitled to receive for helping to ease stress on the grid.

7.       In the example of the factory with three production lines, the factory's baseline would show how much electric energy the factory normally consumed – that is, when it operated all three production lines.  If the participant then entered into the DALRP with this established baseline, and then on certain days decided to temporarily reduce its production lines down to two, it could receive a program payment in an amount corresponding to the reduced electricity use from shuttering one of its production lines.

8.       Retail customers throughout New England pay for the value of the saved energy. Specifically, when retail customers pay for electric service, a portion of their payment flows through the service provider to the demand response provider in the form of a load response payment.  Legitimate load response translates to electricity savings that benefit retail customers. Actual reductions of electricity usage are valuable because they reduce demand during peak hours, thereby reducing (1) the cost of electricity to those who cannot (or do not) reduce usage

and (2) the strain on the grid, thus lowering the likelihood of a blackout.  But when load response is fraudulent that participant is effectively stealing money from retail customers.

9.      The Commission's Office of Enforcement ("Enforcement") conducted a thorough investigation of both Silkman and CES's actions regarding the DALRP.  On July 17, 2012, the Commission ordered Silkman and CES to show cause why they should not be found to have violated the FPA's prohibition against fraud and market manipulation and the corresponding prohibition in the Commission's regulations.  In responding to the Commission's order, Silkman and CES each chose to forgo an administrative hearing before an administrative law judge and instead elected under the FPA that the Commission assess a civil penalty if it found a violation. Based on the briefing in response to the Orders to Show Cause, and its review of the extensive evidence presented and addressed therein, the Commission on August 29, 2013 issued orders finding that Silkman and CES together devised and helped implement a fraudulent scheme to take advantage of the DALRP.  The Orders Assessing Civil Penalties, *Richard Silkman*, 144 FERC ¶ 61,164 (2013) and *Competitive Energy Services LLC*, 144 FERC ¶ 61,163 (2013), are attached as Exhibits 1 and 2, respectively, and incorporated by reference in this petition.

10.     The Commission found that Silkman and CES helped a CES client establish a false baseline to create the illusion that the client was reducing consumption of electricity.  CES and the client were paid for demand response that they neither intended to provide nor actually provided.  The Commission further found that Silkman's and CES's scheme to extract payments for phantom load reductions was a violation of the FPA's prohibition of electricity market manipulation, 16 U.S.C. § 824v(a) (2012), and the corresponding prohibition in the Commission's regulations, 18 C.F.R. § 1c.2 (2013).  Silkman Order Assessing Civil Penalty at P 75; CES Order Assessing Civil Penalty at P 75.

11.     The Silkman Order Assessing Civil Penalty directs Silkman to pay a civil penalty of $1,250,000.  The CES Order Assessing Civil Penalty directs CES to pay a civil penalty of $7,500,000 and disgorge $166,841.13, plus interest, in unjust profits to ISO-NE.

12.     As neither Silkman nor CES made these payments, the Commission seeks, pursuant to FPA Section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B) (2012), an order from this Court (1) affirming the Orders Assessing Civil Penalties with a corresponding judgment, (2) requiring Silkman to pay the $1,250,000 civil penalty, (3) requiring CES to pay the $7,500,000 civil penalty, and (4) requiring CES to disgorge its $166,841.13, plus interest, of unjust profits.

## PARTIES

### A.     Petitioner

13.     FERC is an administrative agency of the United States, organized and existing pursuant to the FPA, 16 U.S.C. § 791a *et seq.*

### B.     Respondents

14.     Richard Silkman resides in Scarborough, Maine.  Silkman was the Managing Member and an employee of CES from the company's formation in 2000 to the present.

15.     CES is a limited liability company organized under the laws of Maine with its principal place of business in Portland, Maine.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to FPA

Section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B).

17.     Following the Commission's July 17, 2012 issuance of Orders to Show Cause and

Notice of Proposed Penalty ("Orders to Show Cause") to CES and Silkman under FPA Section

31(d)(1), 16 U.S.C. § 823b(d)(1), CES and Silkman each elected the procedures of FPA Section

31(d)(3), 16 U.S.C. § 823b(d)(3), pursuant to which the Commission may assess a civil penalty

that, if unpaid, will be reviewed in federal district court.  The Orders to Show Cause, *Richard

Silkman*, 140 FERC ¶ 61,033 (2012) and *Competitive Energy Services, LLC*, 140 FERC ¶ 61,032

(2012), and accompanying Enforcement Staff Report and Recommendation, are attached as

Exhibits 3 and 4, respectively, and are incorporated by reference in this petition.

18.     Pursuant to Silkman's and CES's elections, and after considering their responses,

the Commission assessed the civil penalties set forth in the Orders Assessing Civil Penalties.

Because neither Silkman nor CES paid their respective penalties within 60 days, the statute

requires the Commission to file an enforcement action.  FPA Section 31(d)(3)(B), 16 U.S.C.

§ 823b(d)(3)(B) ("If the civil penalty has not been paid within 60 calendar days after the

assessment order has been made under Subparagraph (A), the Commission shall institute an

action in the appropriate district court of the United States for an order affirming the assessment

of the civil penalty.").  Therefore, the Commission now files this petition for an order from this

Court affirming the assessments of the civil penalties.  Under FPA Section 31(d)(3)(B), 16

U.S.C. § 823b(d)(3)(B), this Court "shall have authority to review de novo the law and the facts

involved, and shall have jurisdiction to enter a judgment enforcing, modifying, and enforcing as

so modified, or setting aside in whole or in Part" the Commission's assessment of the civil penalty.

19.     Venue properly lies within the District of Massachusetts pursuant to FPA Section 31(d)(3)(B), 16 U.S.C. § 823b, and Section 317, 16 U.S.C. § 825p, because portions of the acts or transactions constituting the violation occurred in Massachusetts.  Specifically, (1) Silkman and CES engaged in an unlawful scheme to fraudulently participate in the ISO-NE DALRP in and around New England, including in this District; (2) Silkman and CES communicated false information, including false baseline information, to ISO-NE's Massachusetts headquarters; (3) Silkman's and CES's claims for payment for phantom load reductions were received by ISO-NE in Massachusetts; (4) ISO-NE determined in Massachusetts that it should make those payments; (5) the unlawful scheme defrauded ISO-NE to the detriment of virtually all electricity customers in New England, including those in Massachusetts; and (6) residents of this district were disproportionately harmed by Silkman's and CES's conduct because the highest concentration of demand for electricity in New England is in Boston, Massachusetts.

## THE COMMISSION'S ANTI-MANIPULATION AUTHORITY

20.     In the wake of Enron Corporation's manipulative schemes in the western U.S. electricity markets, Congress, through the Energy Policy Act of 2005, amended the FPA to give the Commission broad authority to prohibit energy market manipulation.  In relevant part, FPA Section 222, 16 U.S.C. § 824v(a), makes it "unlawful for any entity . . . directly or indirectly, to use or employ, in connection with the purchase or sale of electric energy . . . any manipulative or deceptive device or contrivance . . . in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of electric ratepayers."

21.     The Commission implemented this statute in 2006 by promulgating the Anti-Manipulation Rule, which prohibits an entity from committing fraud by: (1) using a fraudulent device, scheme, or artifice, or making a material misrepresentation or a material omission as to which there is a duty to speak under a Commission-filed tariff, Commission order, rule, or regulation, or engaging in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity; (2) with the requisite scienter; (3) in connection with the purchase or sale of electricity subject to the jurisdiction of the Commission.  18 C.F.R. § 1c.2 ("Anti-Manipulation Rule").  For purposes of this rule, "the Commission defines fraud generally, that is, to include any action, transaction, or conspiracy for the purpose of impairing, obstructing, or defeating a well-functioning market.  Fraud is a question of fact that is to be determined by all the circumstances of a case."  *Prohibition of Energy Market Manipulation*, Order No. 670, 114 FERC ¶ 61,047, at PP 49-50, *reh'g denied*, 114 FERC ¶ 61,300 (2006).

22.     The Energy Policy Act of 2005 also provided the Commission with increased civil penalty authority.  FPA Section 316A, 16 U.S.C. § 825o-1, authorizes the Commission to assess civil penalties against violators up to $1,000,000 for each day that a violation occurs.  The Commission has found that each separate transaction that constitutes a violation is subject to a $1,000,000 per day penalty.  In assessing penalties, the Commission must consider "the seriousness of the violation and the effort of such person to remedy the violation in a timely manner."  FPA Section 316A, 16 U.S.C. § 825o-1.

23.     In 2008, the Commission adopted a policy that it would consider five factors to determine the amount of the civil penalty for violations: (1) seriousness of the offense; (2) commitment to compliance; (3) self-reporting; (4) cooperation; and (5) reliance on prior Enforcement guidance.  *Enforcement of Statutes, Regulations & Orders*, 123 FERC ¶ 61,156 at

8

PP 50-71 (2008).  These factors continue to apply to individuals and the Commission relied on these factors in determining the appropriate civil penalty to assess against Silkman.

24.     In 2010, the Commission adopted Penalty Guidelines, applicable to corporate entities, based on the corporate fine provisions of the U.S. Sentencing Guidelines in an effort to provide greater fairness, transparency, and consistency in its civil penalty determinations. *Enforcement of Statutes, Orders, Rules, and Regulations*, 132 FERC ¶ 61,216 at PP 5-6 (2010) ("Revised Policy Statement on Penalty Guidelines").  The Commission relied on the Penalty Guidelines in determining the appropriate civil penalty to assess against CES.

## BACKGROUND

25.     The Commission set forth in its Orders Assessing Civil Penalties a detailed description of Silkman's and CES's participation in the ISO-NE DALRP.  *See* Silkman Order Assessing Civil Penalty at PP 13-28; CES Order Assessing Civil Penalty at PP 13-28.  In the Orders Assessing Civil Penalties, the Commission concluded that Silkman and CES each committed fraud, assessed a civil penalty of $1,250,000 to Silkman, assessed a civil penalty of $7,500,000 to CES, and ordered CES to disgorge to ISO-NE $166,841.13, plus interest, in unjust profits.

### A.  ISO-NE's DALRP

26.     ISO-NE's DALRP is one of many demand response programs overseen by the Commission.  Demand response can be defined as a "change[] in electric usage by end-use customers from their normal consumption patterns in response to changes in the price of electricity over time, or to incentive payments designed to induce lower electricity use at times of high wholesale market prices or when system reliability is jeopardized."  *U.S. Department of Energy, Benefits of Demand Response in Electricity Markets and Recommendations for*

*Achieving Them: A Report to the United States Congress Pursuant to Section 1252 of the Energy Policy Act of 2005* at 9 (Feb. 2006).  Although there are different demand response programs, all of these programs require, at the least, either consumption of less electricity than normal or production of more electricity than normal.

27.     Simply stated, when a participant signs up for a demand response program such as the DALRP, it agrees that it will change its operations when the electric energy system operator requests load reductions.  And the only acceptable way to respond is through an actual change in behavior that results in the participant using less electricity from the grid than it uses when operating normally.

28.     In the case of the ISO-NE DALRP, this means that participants were offered the opportunity to be paid to use less electric energy than they normally used.  This could be accomplished many ways – for example, by running fewer factory lines, turning off lights, turning down air conditioning, or running an on-site generator at higher levels (and thereby taking less electricity off of the grid).  Regardless of how this was done, it had to be done in a way that resulted in the participants actually reducing their demand for electric energy from the grid by using less electricity than they would have used but-for the demand response program.

29.     In order to accurately calculate the reduction in electricity consumption taken from the grid, ISO-NE first established a baseline for each demand response participant based on a five-day average of the participant's use of electricity from the grid when the participant was not offering to reduce its demand.  In other words, ISO-NE measured each participant's normal electric energy usage during a five-day period before the participant began reducing its demand. Then, once the company began participating in the program, ISO-NE determined the participant's reduced demand by measuring the participant's actual metered load (measured

consumption of electricity) during the hours in which ISO-NE accepted the participant's load reduction.  ISO-NE then subtracted the reduced demand from the participant's baseline demand to determine the participant's actual reduction in electricity usage and then compensated the participant for using less electricity from the grid when compared to the baseline.

30.     ISO-NE calculated the initial baseline by a simple average of hourly meter data for the peak period hours of 7:00 AM through 6:00 PM for electric energy taken from the grid for the initial five business days after the participant was approved for the DALRP.  Once an initial baseline was established, the baseline adjusted on a rolling basis using actual load data from the participant.  That way, if a new participant's normal operations changed over time, the baseline would adjust to reflect the new normal operations and ensure that the participant was not compensated for reducing electricity consumption that would have happened without the incentive provided by the DALRP.

31.     However, not all days were included in the rolling baseline calculation.  When a participant's DALRP offer was accepted for a given day, that day would be excluded from the rolling participant baseline.  Thus, if a participant offered into the DALRP every day, and those offers were accepted every day, the participant could maintain its initial baseline indefinitely. The reason for excluding participation days from the rolling baseline is that the baseline was intended to represent the participant's normal operations absent participation in the DALRP. Loads during demand response days are not typical because participants are reducing their electric energy usage on these days.

32.     DALRP participants could make offers to reduce their demand at a minimum price of $50/Megawatt/hour ("MWh") and a maximum price of $1,000/MWh.  Each offer had to be at least 100 kilowatts/hour ("kWh").  (A megawatt is 1000 kilowatts.)  Each day a participant

would determine whether it had the flexibility to reduce its consumption of electric energy from the grid during the following day's peak period (7:00 AM to 6:00 PM).  If the participant could reduce its consumption, it would offer to reduce its use of electricity from the grid by a certain number of kilowatts or megawatts per hour during the peak period and at a certain price.  If the participant made an offer to reduce electricity consumption at a price that was less than the price of electricity in the area during the following day's peak period, that offer would likely be accepted by ISO-NE and the participant would be compensated for reducing its consumption of electricity.

33.    DALRP participants offered to use less electricity (load reductions) for the next day from the hours of 7:00 AM through 6:00 PM on non-holiday weekdays and, if ISO-NE accepted the offer, the participant was obligated to reduce load the next day.  The participant's real-time electricity usage was measured against its baseline to quantify the load reduction.  As an example, in a given hour if a participant's baseline was 10 MW and actual electrical consumption from the grid was 7 MW, the calculated load reduction was 3 MW.

34.    Some load response participants enrolled in the DALRP with assistance from third-parties known as Enrolling Participants.  The Enrolling Participant registered the load response participant in the DALRP and arranged for ISO-NE to receive load response and meter data from the participant.  ISO-NE made DALRP payments to the Enrolling Participant, and the Enrolling Participant then distributed these revenues to the load response resource and any other entities based upon agreements among those parties.   In other words, Enrolling Participants are middlemen who facilitated communications between load response participants and ISO-NE regarding the DALRP.

### B.  Silkman's and CES's Fraud

35.     CES provides energy consulting and other services to clients throughout North America.  Among other services, CES reviews and facilitates its clients' participation in interstate electricity markets subject to FERC's jurisdiction.

36.     Silkman, the Managing Member of CES, and CES regularly provided energy consulting services to Rumford Paper Company ("Rumford"), a paper mill in Rumford, Maine, and understood the mill's electricity usage.  In particular, Silkman and CES knew that, although Rumford was connected to the electrical grid, it typically used a large, relatively inexpensive on-site generator to meet the substantial majority of its electricity needs to operate the paper mill.

37.     In the spring of 2007, Silkman (on behalf of CES) approached Rumford and suggested that the paper mill enroll in ISO-NE's DALRP.  Silkman and CES were very familiar with this and other ISO-NE programs because of their energy industry experience.

38.     Silkman researched the ISO-NE DALRP.  As a result, Silkman understood that payments made to participants in the program were based upon the difference between the baseline – initially established over the first five days of enrollment – and the participant's subsequently measured electricity consumption.

39.     Silkman understood that the demand response provider would receive compensation from ISO-NE if (1) its electricity consumption from the electric grid was lower than the established baseline and (2) other qualifications were met.

40.     Armed with this knowledge, Silkman proposed a scheme to allow Rumford to be paid for providing demand response without actually providing any such response.  This would be accomplished by Rumford's creating the illusion of reduced electricity usage.

41.     Rumford owned an on-site generator.  On a normal day, Rumford used that generator to fulfill as much of its electricity needs as possible because doing so was cheaper than buying electricity from ISO-NE's grid.

42.      Silkman and another CES partner proposed that Rumford participate in the demand response program by reducing the amount of electricity the mill created with its generator during the initial five-day baseline establishment period.  Instead, Rumford would purchase unusually large amounts of more expensive replacement electricity from the grid during the initial baseline period.  Silkman understood that purchasing electricity would be uneconomic for Rumford in the short term.  But Silkman understood that this otherwise uneconomic purchase of grid electricity was critical to the proposed scheme because Rumford's baseline would be based on its metered consumption of electricity from the grid during these five days.

43.     Silkman expected that Rumford's increased purchases of electricity from the grid during the baseline would cost Rumford approximately $120,000.  Although uneconomic in the immediate term, Silkman informed Rumford that he expected this expense would be earned back in just one week of participation in the DALRP – aided by Rumford's artificially inflated baseline.

44.     Silkman understood that the scheme he proposed would not work unless Rumford's baseline continued to reflect the mill's abnormal curtailing of its on-site generator. He realized that this goal could be accomplished by designing daily offers to ISO-NE to participate in the DALRP so that the offers were almost guaranteed to be accepted.  Silkman told Rumford personnel this, and emphasized that if those bids were accepted, Rumford would receive substantial payments under the DALRP by simply resuming routine operation of its generator without reducing its electricity consumption from the grid.

14

45.     Rumford managers expressed concern about the scheme to Silkman and CES, noting that it appeared that, effectively, Rumford and CES would be paid for doing nothing. Rumford nevertheless authorized CES to take action to register Rumford in the load response program and facilitate the scheme.  CES (including Silkman and other employees) then communicated daily to ISO-NE Rumford's availability to provide approximately 20 MW of electricity "reduction."  This phantom reduction was roughly equal to the amount by which Rumford curtailed its generation during the baseline period.  In other words, Rumford promised to "reduce" its electricity usage (and corresponding grid purchases) by the amount of electricity it uneconomically purchased from the grid during the baseline period.  CES continued the scheme by making these offers at a price that effectively guaranteed that each bid would be accepted, thereby assuring that Rumford's baseline would remain unchanged (absent unforeseen circumstances) and its fraud could continue.

46.     As a result of its phantom reduction of electricity usage, Rumford was paid monthly by ISO-NE for its participation in the DALRP.  Rumford received 85 percent of the value of the "reduced" electricity usage and CES received 5 percent.  The remaining 10 percent was paid to Rumford's Enrolling Participant, Constellation NewEnergy, Inc. ("Constellation").

47.     The scheme designed by Silkman and CES continued from late July 2007 through early February 2008.  During this time, Rumford did not actually reduce electricity consumption as a result of participation in the program.  As detailed in the Orders Assessing Civil Penalties, Silkman and CES were active participants in the scheme and continually concealed Rumford's lack of load reduction to both ISO-NE and Constellation.  *See* Silkman Order Assessing Civil Penalty at PP 13-28; CES Order Assessing Civil Penalty at PP 13-28.

48.     In January 2008, ISO-NE made a presentation notifying market participants that ISO-NE expected to make changes to the program because it had learned that some market participants had wrongly attempted to profit from intentionally establishing and then maintaining an inflated baseline.  The presentation clearly described the scheme designed by Silkman and CES and executed by them in conjunction with Rumford.  Silkman, aware of the presentation, forwarded it to Rumford managers but neither he nor anyone else at CES recommended that they (or Rumford) cease their involvement in the scheme.

49.     Also in January 2008, Silkman also received a phone call from a Constellation Senior Vice-President as well as a copy of a forthcoming letter from Constellation to all of Constellation's DALRP enrollees.  In these communications Constellation explained its concern that certain program participants had artificially increased their electricity usage during their baseline periods.  Constellation also warned that an enrollee could be subject to sanctions if ISO-NE determined that the enrollee committed such "fraud to extract Load Response Program payments."  Despite these communications, Silkman and CES continued their involvement in the scheme and declined to advise Rumford to cease the fraudulent behavior.

50.     On February 8, 2008, ISO-NE changed the program to ensure that baseline inflation schemes, such as the one adopted by Silkman and CES, were no longer profitable. After analysis of electricity usage data, ISO-NE suspected that Rumford (or entities connected to Rumford) had committed fraud and referred the behavior to the Commission for possible enforcement action.

51.     During the period the scheme was in effect, Silkman's and CES's behavior resulted in ISO-NE paying $3,336,964.43 for load response that did not occur.  Those fraudulently obtained payments were shared by CES (and Silkman via his employment by, and

16

ownership of, CES), Rumford, and Constellation.  CES's share was $166,841.13 (5 percent of the total).  Because ISO-NE passes through its demand response costs, consumers of electricity throughout New England were harmed.

### ENFORCEMENT'S INVESTIGATION OF SILKMAN AND CES

52.     Enforcement commenced an investigation of Silkman and CES in February 2008. During the investigation, Enforcement obtained and reviewed thousands of pages of documents. The documents reviewed included emails, internal memoranda, records of Silkman's, CES's, and Rumford's actions related to the DALRP, and other relevant information.  Among other information, Enforcement analysts reviewed electricity consumption and load response offer data from CES and Rumford as well as from ISO-NE.  Enforcement attorneys also deposed Silkman and several third party witnesses (including Rumford and Constellation employees).

53.     Enforcement determined from its investigation that Silkman and CES violated the Anti-Manipulation Rule when, as detailed in paragraphs 35 to 51, *supra*, they devised and helped implement an unlawful scheme to inflate Rumford's baseline and receive compensation for demand response that was neither intended nor actually provided.

54.     Enforcement was unable to reach a settlement with either Silkman or CES, and, consistent with Commission practice, issued letters to CES and Silkman notifying them of Enforcement's intent to seek action by the Commission.  *See* 18 C.F.R. § 1b.19 (2013).  Silkman and CES provided a joint 83-page response to these letters.  This response, along with the Staff Reports detailing Enforcement's findings, was provided to the Commission.  The Staff Reports detailed Enforcement's findings and recommended that the Commission issue separate Orders to Show Cause to Silkman and CES.

55.     On July 17, 2012, the Commission unanimously issued the Orders to Show Cause to Silkman and CES, pursuant to FPA Section 31(d)(1), 16 U.S.C. § 823b(d)(1), *Richard Silkman*, 140 FERC ¶ 61,033 (2012) and *Competitive Energy Services, LLC*, 140 FERC ¶ 61,032 (2012).  In the Orders to Show Cause, the Commission ordered Silkman and CES to show cause why (1) they should not be found to have violated FPA Section 222, 16 U.S.C. § 824v, and the Anti-Manipulation Rule, (2) Silkman should not be assessed a civil penalty of $1,250,000, (3) CES should not be assessed a civil penalty of $7,500,000, and (4) CES should not be ordered to disgorge $166,841.13 in unjust profits, plus interest.

56.     The Orders to Show Cause also required Silkman and CES to each proceed with an administrative hearing before an administrative law judge (subject to review by the United States Court of Appeals) pursuant to FPA Section 31(d)(2), 16 U.S.C. § 823b(d)(2) or, alternatively, to elect the procedures of FPA Section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B), pursuant to which the Commission may assess civil penalties without an administrative law judge hearing and then institute an action in federal district court to affirm the penalty assessment (after the subject fails to pay the penalty within 60 days of the Commission's order). On July 27, 2012, Silkman and CES each elected the procedures of FPA Section 31(d)(3)(B).

57.     Separately, Enforcement investigated Rumford for its participation in the DALRP.  On March 22, 2013, the Commission approved a settlement between Enforcement and Rumford in which Rumford agreed to a $10,000,000 civil penalty and $2,836,419.08 disgorgement of unjust profits from the scheme.  Rumford admitted to many of the central facts also set forth in this petition but neither admitted nor denied that it had violated the FPA.  *See Rumford Paper Company*, 142 FERC ¶ 61,218 (2013).

## AFTER REVIEW OF THE EVIDENCE, THE COMMISSION FOUND SILKMAN AND CES VIOLATED THE ANTI-MANIPULATION RULE

58.     On September 14, 2012, Silkman and CES submitted a joint Answer to the Orders to Show Cause.  On November 13, 2012, Enforcement filed a Reply in each proceeding in opposition to the Silkman/CES joint Answer.

59.     While Enforcement recommended the Commission issue Orders to Show Cause via the Staff Reports, the staff who investigated this case did not advise the Commission during its deliberations.  The Commission's Separation of Functions Rule 2202, 18 C.F.R. § 385.2202, prohibits such investigative staff from participating in findings, conclusions, or decisions unless it is as a witness or counsel in public proceedings.

60.     The Commission reviewed the briefs and extensive documentary and testimonial record and on August 29, 2013, issued separate Orders Assessing Civil Penalties against Silkman and CES, unanimously finding that Silkman and CES violated FPA Section 222 and the Commission's Anti-Manipulation Rule from July 2007 to February 2008 by engaging in a scheme to inflate and then maintain a fraudulent baseline in order to receive payments for demand response that they never intended to provide or actually provided.  Silkman Order Assessing Civil Penalty at P 43; CES Order Assessing Civil Penalty at P 43.

61.     The Commission explained its reasoning in detail, including an evaluation of the legal and factual defenses raised by Silkman and CES.

62.     The Orders Assessing Civil Penalties imposed a $1,250,000 civil penalty against Silkman and a $7,500,000 civil penalty against CES.  The Commission also ordered CES to disgorge $166,841.13 in unjust profits from the manipulative scheme (plus interest), equal to the amount that CES obtained as a consequence of the fraud.

19

63.     The Commission found the civil penalties to be statutorily authorized under the FPA and appropriate in these cases.  Silkman Order Assessing Civil Penalty at P 8; CES Order Assessing Civil Penalty at P 8.

64.     The Commission further determined that the civil penalty assessments against Silkman and CES were consistent with the Commission's policy statements.

**A.  The Commission Found Silkman and CES Engaged in a Manipulative Scheme**

65.     The Commission found that the Silkman/CES scheme constituted a fraudulent scheme or artifice, in violation of section 1c.2 of the Commission's regulations.

66.     Among other findings, the Commission found that Silkman, as a representative of CES, devised and implemented a scheme to inflate Rumford's baseline and thereby obtain payment for non-existent electricity load reductions.

67.     The Commission also found that CES's submission of registration information to ISO-NE falsely claimed that Rumford had the capability to reduce its load by up to 20 MW.

68.     The Commission found that Silkman and CES instructed Rumford to limit the paper mill's on-site generation during the five-day baseline period during which ISO-NE measured the mill's electricity consumption from the grid.  This departure from Rumford's normal generating operating practice was uneconomic, costing Rumford approximately $120,000.  The Commission found that the behavior served no legitimate purpose, but rather ensured that the baseline did not reflect Rumford's normal daily electricity consumption pattern from the electric grid.

69.     The Commission found that this conduct fraudulently communicated to ISO-NE a false baseline for Rumford.  The Commission found that, when Rumford resumed normal

operations at the mill, Silkman and CES falsely portrayed a daily reduction in electricity use from Rumford's inflated baseline.

70.     The Commission also addressed and rejected Silkman's and CES's defenses on this issue.

### B.     The Commission Found Silkman and CES Acted with Scienter

71.     The Commission found Silkman and CES acted with scienter in executing their manipulative scheme.  The Commission found that Silkman and CES acknowledged that Silkman, as an employee of CES, intentionally proposed to Rumford that the mill reduce on-site generation of electricity during the baseline period and then later submit daily offers to reduce load to ISO-NE.

72.     The Commission found that there was no reason for the conduct other than to inflate Rumford's baseline so that Rumford, CES, and Silkman could receive program payments without having to actually reduce Rumford's electricity consumption from the grid.

73.     The Commission also addressed and rejected Silkman's and CES's defenses on this issue.

### C.     The Commission Found the Fraudulent Scheme Involved Jurisdictional Transactions

74.     The Commission found that the fraudulent scheme was in connection with a jurisdictional transaction.  Section 205(a) of the FPA confers jurisdiction to the Commission over "[a]ll rates and charges made, demanded or received by any public utility for or in connection with the . . . sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges." 16 U.S.C. § 824d(a) (2012).

75.     The Commission has jurisdiction over practices that directly or significantly affect rates under the FPA.  ISO-NE's markets are within the Commission's jurisdiction, as is ISO-NE's Commission-approved DALRP.

76.     The Commission also found that it had enforcement jurisdiction over both CES and Silkman (in his individual capacity) as Section 222 of the FPA prohibits manipulation by "any entity," which includes both corporations and individuals.

## CLAIM FOR RELIEF

(Against Silkman and CES for Violating FPA Section 222, 16 U.S.C. § 824v, and the
Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2)

77.     The Commission repeats each and every allegation set forth in Paragraphs 1 through 76, inclusive, as if set forth fully herein.

78.     Silkman and CES used or employed a fraudulent device, scheme, or artifice, or engaged in an act, practice, or course of business that operates or would operate as a fraud or deceit, with scienter, in connection with electric energy subject to the jurisdiction of the Commission in contravention of FPA Section 222, 16 U.S.C. § 824v, and the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2, promulgated to implement that section of the FPA. Silkman's and CES's manipulative scheme involved misrepresentations before and during the baseline period in July 2007, and each successive, daily communication to ISO-NE and Constellation of a willingness and ability to reduce electricity consumption from the grid.

79.     Accordingly, the Commission is entitled to an Order from this Court affirming its assessment of civil penalties against Silkman and CES under FPA Section 31, 18 U.S.C. § 823b(d)(3)(B), requiring Silkman and CES to pay those penalties, and ordering CES to disgorge its unjust profits, plus interest.

## JURY DEMAND

80.      Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands a trial by jury on all issues triable as such.

81.      Although the Commission has included a demand for a jury trial, the Commission respectfully submits that this Court can and should affirm the penalty assessments without modification following a review of the Commission's Orders Assessing Civil Penalties and the materials presented to the Commission during the penalty assessment process.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

(A)      Enter an order and judgment affirming the Commission's assessment of a $1,250,000 civil penalty against Silkman and ordering Silkman to pay that penalty.

(B)      Enter an order and judgment affirming the Commission's assessment of a $7,500,000 civil penalty against CES and ordering CES to pay that penalty.

(C)      Enter an order requiring CES to disgorge the $166,841.13 in unjust profits, plus interest, it obtained as a result of its illegal manipulative scheme.

(D)      Order such other and further relief as may be necessary and appropriate.


Respectfully submitted,

FEDERAL ENERGY REGULATORY COMMISSION

NORMAN C. BAY
Director
Office of Enforcement

23

LARRY D. GASTEIGER
Deputy Director
Office of Enforcement

LARRY PARKINSON
Director
Division of Investigations

DAVID APPLEBAUM
Deputy Director
Division of Investigations


*/s/ Gabriel S. Sterling III*
GABRIEL S. STERLING III
DEMETRA ANAS
NICOLE L. BRISKER
MICHAEL RAIBMAN
SUSAN M. BEALL
Attorneys
Division of Investigations
Office of Enforcement
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC  20426
(202) 502-8891
Gabriel.Sterling@ferc.gov

*Of Counsel*

Christopher R. Donato
Assistant U.S. Attorney
John Joseph Moakley Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02110
(617) 748-3303
Chris.Donato@usdoj.gov

Dated:  December 2, 2013