UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | 1:16-cv-00205-JAW |
| RICHARD SILKMAN, et al., | ) ) | |
| Respondents. | ) | |

**ORDER REGARDING PROCEDURES APPLICABLE TO PETITION FOR ORDER AFFIRMING ASSESSMENT OF CIVIL PENALTIES**

On July 17, 2012, the Federal Energy Regulatory Commission (FERC or Commission) issued orders to show cause to an energy consulting firm and its managing member (Respondents), requiring them to show cause why the Commission should not (1) find them in violation of section 222 of the Federal Power Act (FPA), 16 U.S.C. § 824v, and FERC's rule against energy market manipulation (the Anti-Manipulation Rule); (2) assess civil penalties against the firm and the managing member; and (3) require the firm to disgorge unjust profits.

Pursuant to the FPA, the Respondents, upon receiving the orders to show cause, faced a choice of procedures. First, under 16 U.S.C. § 823b(d)(2), the Respondents could proceed to a hearing before an Administrative Law Judge (ALJ) and appeal any unsatisfactory decision to the Commission and, eventually, to the United States Court of Appeals in accordance with the Administrative Procedure Act (APA). Alternatively, under 16 U.S.C. § 823b(d)(3), the Respondents could bypass a

hearing with an ALJ and request the Commission to make a prompt ruling on the proposed penalties. If the Commission imposed a penalty, and the Respondents failed to pay within sixty days, the Commission could institute an action in the district court for an order affirming the Commission's penalty assessment. The FPA states that, in ruling on the Commission's penalty assessment, the district court "shall have the authority to review de novo the law and the facts involved[.]"

In this case, the Respondents opted for an immediate ruling from the Commission under § 823b(d)(3), and on August 29, 2013, the Commission issued assessment orders imposing the proposed penalties. The Respondents failed to pay the penalties within sixty days. Accordingly, the Commission filed a petition for an order affirming its assessment orders.

In a matter of first impression in the District of Maine, this Court must determine the applicable procedures that govern the Court's de novo review of the Commission's assessment orders. After considering the compelling arguments and authorities both parties bring to bear on the issue, the Court has resisted the temptation to make a grand pronouncement about the scope of de novo review under § 823b(d)(3) and instead concludes, based on the specific circumstances of this case, that it will treat this matter as an ordinary civil action subject to the Federal Rules of Civil Procedure.

## I.     BACKGROUND

### A.     Procedural History

#### 1.     Proceedings in the District of Massachusetts

On December 2, 2013, FERC filed a petition in the District of Massachusetts for an order affirming its assessment orders. *Pet. for Order Affirming FERC's Aug. 29, 2013 Orders Assessing Civil Penalties Against Richard Silkman and Competitive Energy Services, LLC* (ECF No. 1) (*FERC Pet.*). On December 19, 2013, the Respondents filed a motion to dismiss, *Resp'ts' Mot. to Dismiss* (ECF No. 8), and a motion to transfer to the District of Maine. *Resp'ts' Mot. to Transfer* (ECF No. 9). On January 9, 2014, FERC filed oppositions to the motion to dismiss, *FERC's Opp'n to Resp'ts' Mot. to Dismiss* (ECF No. 18), and the motion to transfer. *FERC's Opp'n to Resp'ts' Mot. to Transfer* (ECF No. 19).

On March 3, 2014, Judge Douglas Woodlock notified the parties of an initial scheduling conference and ordered the parties to submit a joint statement regarding scheduling pursuant to Massachusetts Local Rule 16.1. *Notice of Scheduling Initial Scheduling Conf., Order for Joint Statement and Certifications, and Order for Elec. Filing* (ECF No. 20). The parties filed their joint statement on March 25, 2014, highlighting their disagreement about the nature and scope of the applicable procedures. *Joint Rep. Pursuant to Fed. R. Civ. P. 26(f) and Loc. R. 16.1* (ECF No. 22) (*Joint Rep.*).

At the scheduling conference on April 3, 2014, Judge Woodlock denied the motion to transfer without prejudice and scheduled a hearing on the motion to dismiss. *Elec. Clerk's Notes* (ECF No. 23). Additionally, Judge Woodlock ordered initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1) and requested additional briefing regarding how the Court should conduct a "review de novo" under

§ 823b(d)(3). *Id.* The Respondents filed a supplemental brief on procedure on May 9, 2014. *Resp'ts' Suppl. Br. on Pro.* (ECF No. 28) (*Resp'ts' Suppl. Br.*). FERC responded on June 6, 2014. *FERC's Mot. for Leave to Cross-File Contours of the Case Resp.*, Attach. 1, *FERC's Resp. to Resp'ts' Mem. Regarding Ct.'s Auth. to Review De Novo Comm'n's Orders Assessing Civ. Penalties Against Resp'ts'* (ECF No. 37) (*FERC's Suppl. Resp.*).[1]

On July 18, 2014, Judge Woodlock heard arguments on the motion to dismiss and the supplemental briefs on procedure, as well as additional arguments regarding transfer to the District of Maine. *Elec. Clerk's Notes* (ECF No. 43); *Tr. of Mot. Hr'g* (ECF No. 44). Following the hearing, on April 2, 2015, the Respondents filed a second supplemental brief on the applicable procedures. *Resp'ts' Second Suppl. Brief on Pro.* (ECF No. 52) (*Resp'ts' Suppl. Br. II*).

The case was effectively stayed pending resolution of related issues in the United States Supreme Court[2] and the United States Bankruptcy Court for the District of Maine.[3] By April 5, 2016, both matters were resolved, and the proceedings

---

[1]    A word on pagination. For some filings, such as FERC's supplementary response, the pagination of the ECF filing system differs from the pagination of the memorandum. The Court's citations are to the ECF pagination.

[2]    On June 4, 2014, the Respondents moved for judgment on the pleadings, arguing that FERC did not have jurisdiction over demand response programs such as the one at issue in this case. *Resp'ts' Mot. for J. on the Pleadings* at 1–2 (ECF No. 35) (citing *Elec. Power Supply Ass'n v. FERC*, 753 F.3d 216 (D.C. Cir. 2014)). However, in *FERC v. Electric Power Supply Ass'n*, 136 S. Ct. 760 (2016), the Supreme Court held that FERC does have jurisdiction over demand response programs. Accordingly, the Respondents withdrew their motion for judgment on the pleadings. *Resp'ts' Suppl. Br.* (ECF No. 60).

[3]    Another FERC petition was also pending before Judge Woodlock in a related case, *FERC v. Lincoln Paper and Tissue, LLC*, No. 1:13-cv-13056-DPW. On September 28, 2015, Lincoln Paper filed for bankruptcy. As a result, Judge Woodlock stayed the proceedings in both *Lincoln* and *Silkman*. On April 5, 2016, the District of Maine Bankruptcy Court ruled that the automatic bankruptcy stay did not apply to FERC's district court litigation against Lincoln Paper. *In re Lincoln Paper & Tissue, LLC*, No. 15:10715, 2016 Bankr. LEXIS 3501 (U.S. Bankr. D. Me. Apr. 5, 2016). Accordingly, Judge

continued.  On April 11, 2016, Judge Woodlock denied the Respondents' motion to dismiss, *FERC v. Silkman*, No. 13-13054-DPW, 2016 U.S. Dist. LEXIS 48409 (D. Mass. April 11, 2016) (ECF No. 65), and transferred the cases to the District of Maine for further proceedings.  *FERC v. Silkman*, No. 13-13054-DPW, 2016 U.S. Dist. LEXIS 48401 (D. Mass. Apr. 11, 2016) (ECF No. 66).

### 2.    Proceedings in the District of Maine

On April 21, 2016, following transfer to the District of Maine, the Respondents filed an answer to FERC's petition.  *Defs.' Answer* (ECF No. 72).  That same day, the Respondents filed a motion requesting a scheduling conference and an order assigning the case to the complex track.  *Defs.' Mot. for Scheduling Order and Conf.* (ECF No. 73) (*Resp'ts' Mot.*).  Along with their motion, the Respondents filed a declaration from their attorney, Peter Brann, detailing the Respondents' experiences throughout the FERC investigation.  *Mot. for Complex Track*, Attach. 1, *Peter Brann Decl.* (ECF No. 73) (*Brann Decl.*).  On April 28, 2016, FERC responded.  *FERC's Resp. to Resp'ts' Mot. for Scheduling Order and Conf.* (ECF No. 74) (*FERC's Resp.*).  The Respondents replied on May 4, 2016.  *Defs.' Reply Br. in Supp. of Mot. for Scheduling Order and Conf.* (ECF No. 79) (*Resp'ts' Reply*).

On June 3, 2016, the Court held a scheduling conference.  *Minute Entry* (ECF No. 84); *Tr. of Proceedings* (ECF No. 85).  At the scheduling conference, the parties presented arguments concerning the procedures that should govern the Court's de novo review of the Commission's assessment orders.  *Tr. of Proceedings* at 2:24–49:18.

---

Woodlock allowed the proceedings in both cases to continue.  *Silkman*, 2016 U.S. Dist. Lexis 48401, at *2 (D. Mass. Apr. 11, 2016) (ECF No. 66).

The Court ordered additional briefing from the Respondents' regarding (1) the additional documents they wish to obtain from the agency's investigative record, and (2) any additional discovery they require to present the Court with a complete record for de novo review. *Id.* at 46:6–47:2. The Court requested that FERC file a responsive brief to explain (1) why the Respondents are not entitled to discovery as a matter of law, and (2) why the Court should rely solely on FERC's administrative record in reviewing de novo the Commission's assessment orders. *Id.* at 47:25–48:7.

The Respondents filed their discovery brief on July 8, 2016. *Defs.' Br. Concerning Disc.* (ECF No. 86) (*Resp'ts' Disc. Br.*). On July 22, 2016, the Respondents filed a supplemental brief alerting the Court to *FERC v. Maxim Power Corp.* No. 15-30113-MGM, 2016 U.S. Dist. LEXIS 107770 (D. Mass. July 21, 2016). *Defs.' Notice of Suppl. Auth.* (ECF No. 87). On July 29, 2016, FERC filed its brief in response. *FERC's Opp'n to Resp'ts' Br. Concerning Disc.* (ECF No. 88) (*FERC's Disc. Resp.*). The Respondents replied on August 8, 2016. *Defs.' Reply Br. Concerning Disc.* (ECF No. 89) (*Resp'ts' Disc. Reply*). On August 17, 2016, the Respondents filed a second supplemental brief to alert the Court to another recently-decided case, *FERC v. City Power Marketing, LLC*, No. 15-1428-JDB, 2016 U.S. Dist. LEXIS 105421 (D.D.C. Aug. 10, 2016). *Defs.' Second Notice of Suppl. Auth.* (ECF No. 90). FERC responded to the Respondents' notices of supplemental authority on August 29, 2016. *FERC's Resp. to Resp'ts' Notices of Suppl. Auth.* (ECF No. 93) (*FERC's Resp. to Suppl. Auth.*).

### B.    The Parties and Relevant Entities

FERC is an administrative agency of the United States, organized and existing pursuant to the FPA, 16 U.S.C. § 791a *et seq.* *FERC Pet.* ¶ 13. FERC's Office of Enforcement (Enforcement) "initiates and executes investigations of possible violations of the Commission's rules, orders, and regulations relating to energy market structures, activities, and participants. *Office of Enforcement (OE)*, FERC, https://www.ferc.gov/about/offices/oe.asp (last visited January 25, 2017). Based on its investigations, Enforcement may submit reports to the Commission recommending that the Commission institute administrative proceedings. *FERC's Disc. Resp.* at 4. Once the Commission authorizes an administrative proceeding, Enforcement's role shifts from investigator to litigator, and a "wall" goes up between the Commission and its Enforcement arm to prevent ex parte communication. *Id.*

ISO-NE is an independent, non-profit organization that works to ensure the day-to-day reliable operation of New England's bulk electric energy generation and transmission system by overseeing the fair administration of the region's wholesale energy markets. *FERC Pet.* ¶ 2. FERC regulates the markets that ISO-NE administers. *Id.*

Respondent Competitive Energy Services (CES) is a limited liability company organized under the laws of Maine with its principal place of business in Portland, Maine. *Id.* ¶ 15. It provides energy consulting and other services to clients throughout North America. *Id.* ¶ 35. Respondent Richard Silkman resides in Maine and is an employee and managing member of CES. *Id.* ¶ 14.

### C. Alleged Facts

## 1. The Day-Ahead Load Response Program

According to FERC, ISO-NE administers "load response programs" that encourage large electricity users to reduce the amount of electricity they consume from the grid during periods of high or peak demand. *FERC Pet.* ¶ 3. This reduction in consumption helps ease stress on the electric grid and can also help lower electricity prices. *Id.* The specific load response program at issue here is ISO-NE's Day-Ahead Load Response Program (the DALRP). *Id.* ¶ 4. Under this program, a participant could offer to reduce its electricity consumption by a certain amount during the peak hours the following day in exchange for payment from ISO-NE.[4] *Id.* If ISO-NE accepted a participant's offer, and if the participant actually reduced its consumption the following day, then the participant would receive compensation based on the amount of electricity they conserved. *Id.* ¶ 4.

In order to calculate how much a participant actually reduced its electricity consumption, ISO-NE first needed to establish a baseline to reflect the amount of electricity the participant normally demanded from the grid. *Id* ¶ 29. To do so, ISO-NE calculated the participant's average electricity demand between 7:00 AM and 6:00 PM over a five-day period before the participant agreed to reduce its electricity consumption. *Id.* ¶¶ 29–30. Once ISO-NE calculated the baseline, it was able to determine the participant's reduced demand by subtracting the actual electrical

---

[4] Participants could make offers at a minimum price of $50/megawatt/hour (MWh) and a maximum price of $1,000/MWh. *Id.* ¶ 32. Participants had to offer to reduce electricity consumption during peak hours (7:00 A.M. to 6:00 P.M.) by at least .1 MWh. *Id.* Typically, ISO-NE would accept an offer if the offering price was less than the price of electricity in the area during the following day's peak period. *Id.*

consumption from the grid during the hours in which ISO-NE accepted the participant's offer. *Id.* ¶ 29.

After establishing the participant's initial baseline, ISO-NE continued to adjust the baseline on a rolling basis in order to reflect changes in a participant's normal operations over time. *Id.* ¶ 30. However, ISO-NE could not adjust the baseline on days when it accepted a participant's offer to reduce consumption because the participant's consumption on those days would not reflect its normal operations. *Id.* ¶ 31. Consequently, if ISO-NE accepted a participant's offer every day, the participant could maintain its initial baseline indefinitely. *Id.*

### 2.    Silkman and CES's Alleged Fraud

In its Petition, FERC makes the following allegations regarding CES's and Dr. Silkman's supposed involvement in a scheme to defraud ISO-NE. According to FERC, CES and its managing member, Dr. Silkman, regularly provided energy consulting services to Rumford Paper Company (Rumford), a paper mill in Rumford, Maine. *Id.* ¶ 36. As a result, CES and Dr. Silkman knew that, although Rumford was connected to the electrical grid, it typically used a large, relatively inexpensive on-site generator to meet the substantial majority of its electricity needs to operate the paper mill. *Id.* In the spring of 2007, Dr. Silkman approached Rumford and suggested that the paper mill enroll in the DALRP. *Id.* ¶ 37.

Rumford enrolled in the DALRP with assistance from an Enrolling Participant, Constellation NewEnergy, Inc. (Constellation). *Id.* ¶ 46. An Enrolling Participant is a third-party that helps register participants in the DALRP and arranges for ISO-NE

to receive load response and meter data from the participant. *Id.* Additionally, an Enrolling Participant serves as a middleman, receiving payments from ISO-NE and distributing the revenue to the participant. *Id.*

Dr. Silkman and another CES partner advised Rumford to reduce the amount of electricity the mill created with its generator during the initial five-day baseline calculation period and purchase unusually large amounts of more expensive replacement electricity from the grid. *Id.* ¶ 42. Dr. Silkman understood that this otherwise uneconomic short-term purchase of grid electricity would artificially inflate Rumford's baseline. *Id.* Dr. Silkman also understood that by designing daily offers to ISO-NE that were almost guaranteed to be accepted, Rumford could maintain its inflated baseline indefinitely. *Id.* ¶ 44. Dr. Silkman told Rumford personnel that if those bids were accepted, Rumford would receive substantial payments under the DALRP by simply resuming routine operation of its generator without reducing its electricity consumption from the grid. *Id.*

Although Rumford managers expressed concern about the scheme to Dr. Silkman and CES, noting that it appeared that they would be paid for doing nothing, Rumford nevertheless authorized CES to register Rumford in the DALRP and facilitate the scheme. *Id.* ¶ 45. CES, including Dr. Silkman, then communicated daily with ISO-NE regarding Rumford's availability to provide approximately 20 MW of electricity reduction. *Id.* This phantom reduction was roughly equal to the amount by which Rumford curtailed its electricity generation during the baseline period. *Id.*

CES continued the scheme by making offers at a price that effectively guaranteed acceptance, thereby assuring that Rumford's baseline would remain unchanged. *Id.*

The scheme continued from late July 2007 through early February 2008. *Id.* ¶ 47. During this time, Rumford did not actually reduce electricity consumption below its normal levels. *Id.* Dr. Silkman and CES actively participated in the scheme and continually concealed Rumford's lack of demand reduction from ISO-NE and from Constellation, Rumford's Enrolling Participant. *Id.*

In January 2008, ISO-NE made a presentation notifying market participants that ISO-NE expected to make changes to the program because it had learned that some market participants had wrongly attempted to profit from intentionally establishing and then maintaining an inflated baseline. *Id.* ¶ 48. The presentation clearly described the scheme that Dr. Silkman and CES designed and executed in conjunction with Rumford. *Id.* Dr. Silkman was aware of the presentation and forwarded it to Rumford managers, but neither he nor anyone else at CES recommended that Rumford cease its involvement in the scheme. *Id.*

Also in January 2008, Dr. Silkman received a phone call and a letter from Constellation explaining its concern that certain program participants had artificially increased their electricity usage during their baseline periods and warned that an enrollee could be subject to sanctions if ISO-NE determined that the enrollee committed fraud to extract load response program payments. *Id.* ¶49. Despite these communications, Dr. Silkman, CES, and Rumford continued their involvement with the scheme. *Id.*

During Rumford's participation in the DLARP, ISO-NE paid $3,336,964.43 for load response that it contends did not occur. *Id.* ¶ 51. Rumford, Constellation, and CES shared the ISO-NE payments. CES—and Dr. Silkman as a result of his employment and ownership—received $166,841.13, or five percent of the total payments. *Id.*

### 3. Enforcement's Investigation of Dr. Silkman and CES

On February 8, 2008, ISO-NE altered the DALRP program to guard against baseline inflation. *Id.* ¶50. After analysis of electricity usage data, ISO-NE suspected that Rumford had committed fraud and referred the behavior to FERC for possible enforcement action. *Id.*

Enforcement commenced an investigation of Dr. Silkman and CES in February 2008. *Id.* ¶ 52. During the investigation, Enforcement obtained and reviewed thousands of pages of documents, including emails, internal memoranda, and electricity consumption and load response offer data. *Id.* Enforcement also deposed Dr. Silkman and several third-party witnesses, including Rumford and Constellation employees. *Id.* Enforcement determined from its investigation that Dr. Silkman and CES devised and implemented a scheme to inflate Rumford's DALRP baseline in violation of section 222 of the FPA and the Commission's Anti-Manipulation Rule. *Id.* ¶ 53.

Enforcement was unable to reach a settlement with either Dr. Silkman or CES and therefore issued letters notifying them of Enforcement's intent to seek action by the Commission. *Id.* ¶ 54. Dr. Silkman and CES submitted a joint 83-page response

to these letters. *Id.* Enforcement provided this response to the Commission, along with a report detailing Enforcement's findings, and recommended that the Commission issue orders to show cause to CES and Dr. Silkman. *Id.*

### 4. FERC Issues Orders to Show Cause

On July 17, 2012, the Commission unanimously agreed to issue the orders to show cause to Dr. Silkman and CES. *Id.* ¶ 55. The orders required Dr. Silkman and CES to show cause why the Commission should not: (1) find them in violation of section 222 of the FPA, 16 U.S.C. 824v, and the Commission's Anti-Manipulation Rule; (2) assess a $1,250,000 civil penalty against Dr. Silkman; (3) assess a $7,500,000 civil penalty against CES; and (4) require CES to disgorge $166,841.13 in unjust profits. *Id.* ¶ 55.

The orders also explained that Dr. Silkman and CES were required to elect either an administrative hearing before an ALJ pursuant to 16 U.S.C. § 823b(d)(2) or an immediate ruling by the Commission under 16 U.S.C. § 823b(d)(3). *Id.* ¶ 56. As FERC explained to Dr. Silkman and CES in the orders to show cause:

> If Respondent elects an administrative hearing before an ALJ, the Commission will issue a hearing order; if Respondent elects an immediate penalty assessment, and if the Commission finds a violation, the Commission will issue an order assessing a penalty. If such penalty is not paid within 60 days of assessment, the Commission will commence an action in a United States district court for an order affirming the penalty, in which the district court may review the assessment of the civil penalty *de novo.*

*FERC Pet.*, Attach. 5, *Order to Show Cause and Notice of Proposed Penalty* at 3–4 (ECF No. 1); *FERC Pet.*, Attach. 6, *Order to Show Cause and Notice of Proposed Penalty* at 3–4 (ECF No. 1). On July 27, 2012, CES and Dr. Silkman requested an

immediate penalty assessment by the Commission under § 823b(d)(3). *FERC Pet.* ¶ 56.

On September 14, 2012, Dr. Silkman and CES submitted a joint answer to the orders to show cause. *Id.* ¶ 58. On November 13, 2012, Enforcement filed a reply. *Id.*

### 5. FERC Assesses Civil Penalties

On August 29, 2013, after reviewing the briefs and the evidence that Enforcement provided, the Commission issued orders assessing civil penalties against CES and Dr. Silkman. *Id.* ¶ 60. The Commission unanimously found:

1) Dr. Silkman and CES violated FPA section 222 and the Commission's Anti-Manipulation Rule from July 2007 to February 2008 by engaging in a scheme to inflate and then maintain a fraudulent baseline in order to receive payments for load response that they never intended to provide or actually provided. *Id.* ¶¶ 60, 66–69.

2) Dr. Silkman and CES acted with scienter in executing their manipulative scheme. Dr. Silkman and CES acknowledged that Dr. Silkman, as an employee of CES, intentionally proposed to Rumford that the mill reduce on-site generation of electricity during the baseline period and then later submit daily offers to reduce load to ISO-NE. *Id.* ¶¶ 71–73.

3) The Commission had enforcement jurisdiction over both CES and Dr. Silkman for their involvement with the scheme. *Id.* ¶¶ 74– 76.

The Commission issued assessment orders in accordance with Enforcement's recommendations. *Id.* ¶ 62. Dr. Silkman and CES both failed to pay their penalties within sixty days; therefore, pursuant to § 823b(d)(3)(B), the Commission filed a petition with this Court for an order affirming the assessment of the civil penalties. *Id.* ¶ 12.

## II.  PARTIES' POSITIONS

The question before the Court is what procedures should govern the Court's de novo review of the Commission's assessment orders. As the procedural history of this case demonstrates, the parties have thoroughly briefed and argued their positions. In general, the Respondents argue that the FPA requires this Court to treat the matter as an ordinary civil action governed by the Federal Rules of Civil Procedure. As such, the Respondents assert that they are entitled to discovery, including information relating to FERC's investigation. Further, the Respondents contend that the Court must hold a trial if factual disputes persist following discovery.

By contrast, FERC insists that this is not a normal civil action and that the text of the FPA does not compel the Court to grant discovery or hold a trial. Instead, FERC contends that the statute grants the Court broad discretion to design appropriate procedures in its review of the Commission's assessment orders. FERC believes that in order for the Court to determine the scope of its review, the Court

should first examine the assessment orders themselves. Once the Court examines the orders, the Court may decide that it is able to immediately rule on the Commission's orders, or the Court may wish to supplement its review with documents from the administrative record, which FERC defines as "[a]ll communications with the Commission and all materials considered by the Commission in the adjudication—including submissions by Enforcement and Respondents and the documents relied upon therein[.]" *FERC's Disc. Resp.* at 4. FERC acknowledges that the statute permits the Court to order discovery and a trial but argues that, given the extensive adversarial proceedings at the agency level in this case, the Court's review should "begin…and end…with the Assessment Orders, supplemented as necessary by the administrative record[.]" *Joint Rep.* at 4. FERC predicts that "no discovery will prove necessary and, if discovery is required, it should be minimal and directed to specific issues." *Id.*

## A. Respondents' Positions

### 1. The Federal Rules of Civil Procedure Govern the Court's De Novo Review of the Assessment Orders

The FPA states that in reviewing the Commission's assessment orders, the district court "shall have the authority to review de novo the law and the facts involved." 16 U.S.C. § 823b(d)(3)(A). The Respondents characterize this de novo review as an ordinary civil action that requires the application of the Federal Rules of Civil Procedure—including rules concerning discovery—and the Federal Rules of Evidence. *Resp'ts' Suppl. Br.* at 6. The Respondents note that Federal Rule of Civil Procedure 81 identifies certain instances in which the Federal Rules do not apply to

civil actions and that penalty enforcement actions under the FPA are not among the list of exceptions. *Id.* More generally, the Respondents assert that if "'*de novo*' review is to be given any meaning, *both* sides should be permitted to develop the evidence through the usual tools of discovery, and *both* sides should be permitted to participate in a trial to determine the facts." *Id.*

To underscore their argument, the Respondents contrast the FPA's two procedural options. *Id.* at 8–9. Under the first option (Option 1), the targets of FERC investigations are entitled to a hearing in front of an ALJ and may appeal any unsatisfactory decision to the Commission and, eventually, to the United States Court of Appeals in accordance with the APA. *Id.* at 8 (citing 16 U.S.C. § 823b(d)(2)(A)). Under the second option (Option 2), the Commission "promptly" issues a penalty and may seek de novo review of the law and the facts in a district court to enforce the penalty assessment. *Id.* at 8–9 (citing 16 U.S.C. § 823b(d)(3)(B).

The Respondents argue that if de novo review under Option 2 did not include discovery and, if necessary, a trial, then it would not provide a meaningful alternative to Option 1. *Id.* at 9–10. Option 1 entitles the targets of FERC investigations to full discovery, a hearing, review by the Commission, and judicial review by a United States Court of Appeals. Without discovery and the possibility of a trial, then the district court's review in Option 2 would accomplish nothing more than the Court of Appeals' review in Option 1, yet the target of the investigation would not have the concomitant benefit of discovery or a hearing. According to the Respondents, "[i]t strains credulity to claim, as FERC has, that [Respondents] are entitled to discovery

and due process *only* if they choose an administrative proceeding over a district court proceeding." *Resp'ts' Mot.* at 3–4.

Relatedly, the Respondents argue that the Court should not limit its de novo review to the administrative record, as FERC suggests, because no proper administrative record exists in this case. *Resp'ts' Suppl. Br.* at 7. The Respondents claim that because they selected Option 2, there was no administrative proceeding in front of an ALJ, and thus no administrative record. *Id.* The Respondents insist that what the Commission refers to as an "administrative record" is actually a subset of documents that Enforcement "cherry-picked" from among "thousands of pages" of investigative materials and provided to the Commission to serve as the basis of the Commission's assessment orders. *Resp'ts' Disc. Br.* at 4.

The Respondents assert that they do not have access to the majority of evidence that FERC collected in the course of its investigation. *Resp'ts' Suppl. Br.* at 7. This alone, the Respondents contend, warrants additional discovery to supplement the record in this case. *Id.* (citing *Depico v. Goldschmidt*, 687 F.2d 644, 654 (2nd Cir. 1982) (permitting discovery where the administrative record lacked documents that formed the basis for the agency's decision)). For instance, the Respondents allege that FERC deposed numerous entities and individuals and collected information through both formal data requests and informal channels. *Joint Rep.* at 5–6. According to the Respondents, FERC barred the Respondents from attending the depositions and forbade them from reviewing the deposition transcripts. *Id.* at 6. Further, the Respondents state that, despite repeated requests, FERC refused to

share the information it collected with the Respondents unless FERC deemed the information exculpatory. *Id.*

To underscore their lack of access to FERC's investigatory materials, the Respondents point out that FERC's initial disclosures in this litigation revealed a list of individuals with "relevant knowledge"; however, the Respondents allege that they do not even recognize some of the listed names. *Resp'ts' Disc. Br.* at 8. As further proof, the Respondents provide a series of Bates numbers that the Respondents assert correspond to documents that formed part of FERC's investigation but were never produced to the Commission or the Respondents. *Id.* at 4–5. Apart from these documents, the Respondents continue to "believe that FERC conducted depositions that have not been identified to [the Respondents]." *Id.* at 5.

The Respondents maintain that "[s]ince discovery was unavailable, or one-sided, in the investigation in this case, the weight of authority…supports discovery and the introduction of new evidence in *de novo* proceedings." *Resp'ts' Suppl. Br.* at 11 (quoting *Saunders v. United States*, 507 F.2d 33, 36 (6th Cir. 1974) ("Since the procedures followed at the administrative level do not provide for discovery or testing of evidence of [an agency] by cross-examination, it is particularly important that an aggrieved person who seeks judicial review in a trial de novo not be deprived of these traditional tools…"); *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1, 23 (1974); *Broad St. Mkt., Inc. v. United States*, 720 F.2d 217, 220 (1st Cir. 1983)).

The Respondents point out that "FERC's position of summary review of the existing 'record'" is contrary to FERC's approach in *Federal Energy Regulatory*

*Commission v. MacDonald*, 862 F. Supp. 677 (D.N.H. 1994), another case interpreting "review de novo" in the context of the FPA. *Resp'ts' Suppl. Br.* at 10. According to the Respondents, "FERC appropriately filed a *complaint* against a *defendant* in the *MacDonald* case, rather than a *petition* against *respondents* in this case, and in *MacDonald*, the parties engaged in discovery, including depositions." *Id.* at 10–11 (emphasis in original). The Respondents surmise that "FERC's change in position is due to its attempt to avoid the otherwise dispositive statute of limitations defense available if this case is treated as a civil action subject to the general five-year statute of limitations." *Id.* at 11.

Furthermore, the Respondents highlight that FERC itself previously recognized that § 823b(d)(3) provides for a de novo "trial." *Id.* at 10 (citing *Procedures for the Assessment of Civil Penalties Under Section 31 of the Federal Power Act*, 53 Fed. Reg. 32,035, 32,039 (Aug. 23, 1988) (noting that "the assessment of civil penalties by the Commission" under Option 2 "merely triggers the process leading to a de novo trial")). Moreover, the Respondents point out that, even in the present case, FERC agrees that the Court has discretion to order a full trial. *Resp'ts' Disc. Br.* at 1. Similarly, Judge Woodlock confirmed in his order on the Respondents' motion to dismiss that "*de novo* review may allow for the evaluation of evidence that was not a part of the agency administrative record and may or may not require other trial-like proceedings." *Id.* at 2 (quoting *Silkman*, 2016 U.S. Dist. LEXIS 48409, at *26 n. 5).

Finally, the Respondents identify two recent cases that discuss, for the first time, the procedures applicable to a district court's review of FERC's assessment of

civil penalties under the FPA. *Notice of Suppl. Auth.* at 1 (citing *Maxim Power*, 2016 U.S. Dist. LEXIS 107770); *Second Notice of Suppl. Auth.* at 1 (citing *City Power*, 2016 U.S. Dist. LEXIS 105421). According to the Respondents, these cases hold that a district court performing a review de novo of FERC's penalty assessments must treat the matter as an ordinary civil action subject to the Federal Rules of Civil Procedure.

### 2. Due Process Requires the Court to Apply the Federal Rules of Civil Procedure to the Court's De Novo Review

The Respondents argue that FERC's preferred procedural approach—namely, to limit the Court's de novo review to the assessment orders and the administrative record—would deprive the Respondents of due process. *Resp'ts' Suppl. Br.* at 13. The Respondents argue that notions of fundamental fairness compel the Court to grant the Respondents discovery and, if necessary, a trial in accordance with the Federal Rules of Civil Procedure. *Id.* at 13–17.

The Respondents submit that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 13 (citing *Mathews v. Eldridge*, 424 U.S. 319, 322 (1976)). They explain that *Mathews* articulated a three-factor test to determine what process is due. *Id.* Applying the *Mathews* test, the Respondents conclude that FERC's preferred approach would not provide adequate process. *Id.*

The first factor concerns the private interests at stake. *Id.* at 13. The Respondents insist that the stakes are "enormous since FERC is attempting to assess millions in penalties that would bankrupt both Dr. Silkman and CES." *Id.* The second factor relates to the risk of error given the established procedures. *Id.* The

Respondents argue that the risk of error is high because "FERC engaged in a one-sided investigation, and it has denied Respondents the opportunity to engage in even limited discovery or to review the entire record." *Id.* The final factor deals with the governmental interest in maintaining the established procedures. *Id.* at 14. The Respondents argue that "FERC has not asserted any government interest in prohibiting Respondents from taking discovery, confronting the evidence and witnesses against them, and presenting evidence in a district court hearing, much less one that could override Respondents' rights to due process." *Id.*

Additionally, the Respondents claim that "[c]ourts time and again have noted that limitations on discovery implicate the fundamental fairness of the adjudicative process" *Id.* at 15 (citing *McClelland v. Andrus*, 606 F.2d 1278, 1286 (D.C. Cir. 1979) ("[D]iscovery must be granted if in the particular situation a refusal to do so would prejudice a party as to deny him due process")). Likewise, the Respondents contend that it is "elementary that due process within administrative procedures requires the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* (quoting *Raper v. Lucy* 488 F.2d 745 (1st Cir. 1973) (internal quotation marks omitted)). "[D]ue process demands more than simply an opportunity to offer one's side of the story[.]" *Resp'ts' Mot.* at 8 (citing *King v. Higgins*, 370 F. Supp. 1023, 1028 (D. Mass. 1974) ("The opportunities to present evidence and to confront adverse witnesses are safeguards to even the most conservative view of fundamental fairness")). Rather, "courts have stated that an opportunity to be heard requires that an individual be afforded some kind of hearing." *Id.* (quoting *Gorman v. Univ. of*

*Rhode Island*, 837 F.2d 7, 13 (1st Cir. 1988)). The Respondents claim, however, that FERC's preferred procedure would deprive them of this "opportunity to be heard demanded by the due process." *Resp'ts' Suppl. Br.* at 15.

The Respondents seek discovery and a trial in the district court in part because they perceive the Commission's procedures at the agency level to be fundamentally unfair. *Id.* at 15–17. For instance, the Respondents argue that agency rules permit Enforcement to speak directly to the Commissioners responsible for assessing the penalties up until the Commission issue orders to show cause. *Id.* at 15. According to the Respondents, this meant that Enforcement and the Commission were able to communicate and work together for more than two and a half years in this case. *Id.* Moreover, the Respondents question the impartiality of the "captive ALJs" employed by FERC. *Resp'ts' Mot.* at 2. They indicate that "[i]n every civil penalty proceeding that a FERC ALJ has decided since 2005, save one, the ALJ that FERC has assigned has agreed with the Commissioners and imposed the Commission's proposed penalties." *Id.* at 3. The Respondents assert that this procedural unfairness drove their decision to bypass a hearing with an ALJ under Option 1 and pin their hopes instead on de novo review at the district court under Option 2. *Id.* at 3, 6.

### 3. The Respondents' Discovery Requests

The Respondents seek the following discovery in this case:

1) Data and information underlying FERC's claims and theories in this matter;

2) Any discovery conducted and information gathered by FERC in the underlying investigations as well as in related investigations that led to the initiation of separate actions against the Respondents;

3) Information relating to FERC's investigative process, including communications between or among FERC Commissioners or Enforcement relating to the investigatory proceedings;

4) FERC's communications with ISO-NE and Constellation relating to the Respondents or the DALRP; and

5) Any information relating to any expressed confusion or request for clarification relating to the DALRP.

*Joint Rep.* at 8–9. In addition, the Respondents anticipate deposing and issuing document subpoenas to ISO-NE, Constellation, Rumford Paper Company, and possibly other third parties. *Id.* at 9.

### 4. Complex Track

The Respondents further request that the Court assign the case to the complex track pursuant to Local Rule 16.1(c). *Resp'ts' Mot.* at 1. The Respondents assert that the case is appropriate for the complex track given the complexity of the DALRP, the number of potential witnesses, and the amount of data and other documents. *Id.* at 9–10.

### B. FERC's Positions

#### 1. The Court Does Not Need to Order Discovery or a Trial to Review De Novo the Assessment Orders

24

### a.    The FPA's Statutory Language

FERC argues that the language of the FPA does not require the Court to order discovery or hold a trial as part of its review of the Commission's assessment orders. *Joint Rep.* at 5.  FERC points out that § 823b(d)(3)(B) states that the Court "shall have authority to review de novo" the Commission's assessment orders.  *FERC's Suppl. Resp.* at 21.  According to FERC, "authority" is "[o]ften synonymous with power." *Id.* at 22 (quoting BLACK'S LAW DICTIONARY 329 (5th ed. 1979)).  "Congress' decision to grant the Court the 'authority' to review the Assessment Orders therefore means that the Court has the power to conduct a review, but it does not mean that it must perform any particular type of review." *Id.* at 22 (citing *Pacific Lighting Serv. Co. v. FPC*, 518 F.2d 718, 720 (9th Cir. 1975)). Rather, the Court has "great latitude in determining how to conduct its review of the underlying Commission Assessment Order." *Joint Rep.* at 5.

FERC contends that the Respondents' argument that the Federal Rules of Civil Procedure must apply ignores the words "shall have the authority," thereby violating the rule of statutory interpretation that "every word in a statute is to be given meaning whenever possible." *FERC's Suppl. Resp.* at 22 (citing *U.S. v. Ven-Fuel, Inc.*, 758 F.2d 741, 751–52 (1st Cir. 1985)).  FERC states that "[h]ad Congress intended to require a trial, it could have done so simply by saying…that the court 'shall' conduct a 'trial.'" *Id.* at 24.  Indeed, FERC points out, Congress explicitly provides for a "*trial de novo* when a district court reviews civil penalties relating to employee health benefit plans." *Id.* at 24 (citing 42 U.S.C. § 300e-9(d)(3)).  Thus, according to FERC,

the plain language of the FPA indicates that the Court does not need to order discovery or hold a trial to review the Commission's assessment orders.

### b. Nature of "Review De Novo"

FERC characterizes the Court's task as a "judicial review of administrative orders issued by the Commission[.]" *Joint Rep.* at 3. This, in FERC's view, does not require discovery or a trial. *FERC's Suppl. Resp.* at 9. In support of this characterization, FERC points to the text of the FPA, caselaw, and Judge Woodlock's earlier statements in this case. First, FERC highlights that in § 823b(d)(3)(B), Congress directed the Commission to file an action seeking to "affirm" the penalties it levied. *Id.* at 25. FERC contends that "[t]he result of a 'trial' is not an affirmation, the result of a 'review' often is." *Id.* at 25.

Second, FERC cites *Doe v. United States*, 821 F.2d 694 (D.C. Cir. 1987), which stated that "de novo review, in diverse contexts, does not necessarily require any trial-type hearing…" *FERC's Resp. to Suppl. Auth.* at 2 n.2 (citing *Doe*, 821 F.2d at 697–98 n.10). Finally, FERC relies on a passage in Judge Woodlock's order on the Respondents' motion to dismiss. According to FERC, Judge Woodlock determined that the Commission "conducted an adjudication" and that this Court's task was to "review" the agency action resulting from that adjudication: "Although this court's *de novo* review may gain some procedural richness in the context of an action seeking enforcement of an administrative order, that potential does not change the fundamental nature of this court's task—which is to 'review' agency action…" *Id.* at

1 (citing *Silkman*, 2016 U.S. Dist. LEXIS 48409, at *26). In FERC's view, Judge

Woodlock's pronouncement indicates that the Respondents are not entitled to a trial:

> It is law of this case that the Commission conducted an adjudication
> subject to judicial review. The Court should focus instead on the
> question left open by Judge Woodlock's ruling: *how* the Court will
> perform its review[.]

*Id.* at 2.

FERC acknowledges that the FPA permits the Court to order discovery and

hold a full trial. *Joint Rep.* at 4–5. However, given the lengthy proceedings at the

administrative level in this case, FERC believes that the Court's de novo review

should begin and end with the Commission's assessment orders themselves,

"supplemented as necessary by the administrative record compiled in the

Commission's assessment proceedings." *Id.* at 4. This approach, FERC contends, is

consistent with the application of de novo review in other contexts. *FERC's Disc.*

*Resp.* at 9 n. 34. According to FERC, "[t]his standard of review has been most

commonly applied in Employee Retirement Income Security Act (ERISA) cases,

where well-developed case law makes clear that a reviewing court should rarely look

beyond the administrative record." *Id.* FERC thus encourages the Court to adopt the

ERISA framework and look no further than the administrative record to affirm the

Commission's assessment orders. *FERC's Disc. Resp.* at 9–10.

Finally, FERC acknowledges its previous statement that when "district court

procedures are followed, the assessment of civil penalties by the Commission merely

triggers the process leading to a de novo trial." *FERC's Suppl. Resp.* at 32 (quoting

*Procedures for the Assessment of Civil Penalties Under Section 31 of the Federal Power*

*Act*, 53 Fed. Reg. 32, 035, 32, 039 (Aug. 23, 1988)). However, FERC insists that the Respondents place "far more weight on [the Commission's prior statements] than is proper." *Id*. FERC points out that the Commission made the statement in 1988, and that since then, the Commission has amended its procedures and has made other, more recent statements referring to de novo review, not de novo trial. *Id*. at 33.

### 2. Due Process Does Not Require the Court to Apply the Federal Rules of Civil Procedure

FERC maintains that the Commission's enforcement process gave the Respondents a full and fair opportunity to present exculpatory evidence and argument in support of their positions, and therefore the Court does not need to order further discovery and hold a trial to protect the Respondents' due process rights. *Id*. at 34. FERC alleges that Enforcement solicited evidence and argument from the Respondents on two occasions and that the Respondents availed themselves of both opportunities. *Id*. However, FERC asserts that the Respondents were "unable to make a convincing case in the face of strong evidence against them" even though the evidence demonstrating the Respondents' fraud "came from their own data, their own files, their own conduct, and the mouths of their own employees." *Id*. at 35–36.

FERC also contends that the Respondents "are wrong when they claim that they were not given the opportunity for written or oral discovery, hearing, or cross examination of witnesses." *Id*. at 38 (emphasis omitted). FERC explains that if the Respondents selected Option 1—that is, a hearing in front of an ALJ—then they would have had full access to discovery and the ability to present and cross-examine witnesses. *Id*. at 30. However, the Respondents opted to have the Commission

directly assess the penalty. *Id.* at 38. Thus, according to FERC, the Respondents had an opportunity for a hearing, but "they chose not to exercise" it. *Id.*

FERC also distinguishes the Respondents' due process cases. *Id.* at 36–38. For instance, FERC argues that *McClelland* acknowledges that "the extent of permissible discovery in an agency proceeding 'is primarily determined by the particular agency.'" *Id.* at 36 (citing *McClelland*, 606 F.2d at 1286). Additionally, FERC argues that the three-factor test from *Mathews* is inapposite because the Respondents had the opportunity "to present evidence, witnesses, and arguments" by choosing Option 1. *Id.* at 37. Also, FERC contends that *Mathews'* "most important teaching is that a due process analysis in the administrative realm requires pragmatic balancing and granting substantial latitude to agencies to fashion procedures to resolve disputes." *Id.* (citing *Mathews*, 424 U.S. at 348–49).

Finally, FERC addresses the Respondents' concerns about ex parte communication between the Commission and FERC leading up to the orders to show cause. *Id.* at 34 n. 41. FERC insists that such contact is permissible, *id.* at 34 n. 41 (citing *Withrow v. Larkin*, 421 U.S. 35 (1975)), and that the Commission is an unbiased adjudicator. *FERC's Disc. Resp.* at 2. FERC maintains that no contact took place after the Commission issued the orders to show cause, and that Commission regulations require the erection of an ethical wall during the remainder of the adversarial provisions. *FERC's Suppl. Resp.* at 34 n. 41.

### 3. The Court Should Not Order Discovery or Grant Access to FERC's Investigative Files

Although FERC acknowledges that the FPA grants reviewing courts the authority to order discovery, FERC asserts a number of reasons why discovery is not appropriate here. First, FERC argues that the Respondents waived their rights to discovery in this case. Second, FERC contends that the Respondents have not shown that discovery is required. Finally, FERC argues that the Respondents seek to discover confidential information.

### a. Respondents Waived Requests for Investigative Materials or Discovery

First, FERC asserts that the Respondents in this case waived their rights to additional documents or testimony because they failed to request these materials in front of the Commission. *FERC's Disc. Resp.* at 4. FERC argues that "[o]rderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts[.]" *Id.* at 5 (quoting *U.S. v. LA Tucker Truck Lines*, 344 U.S. 33, 36–37 (1952)). FERC asserts the Respondents did not notify the Commission of the need for additional facts for their defense or for specific documents or testimony. *Id.* at 5–6. Thus, FERC believes that the Respondents have waived any right to these materials. FERC argues that its position accords with Judge Woodlock's earlier statement regarding waiver: "the fundamental nature of this court's task…is to 'review' agency action[.]…[This] does not alter the basic rule that an argument may be waived by the failure to raise it at an appropriate time—such as at the time required by the agency's rules." *Id.* at 5 n. 18 (quoting *Silkman*, 2016 U.S. Dist. LEXIS 48409, at *26).

Additionally, FERC argues that the Respondents waived any right to discovery by electing to forgo a formal hearing in front of an ALJ. *Id.* at 6. FERC points out that the Respondents bypassed a hearing in favor of prompt Commission adjudication. *Id.* Because the Respondents chose to forgo a hearing at the agency level, and because they failed to request specific documents or testimony before the Commission, FERC contends that the Respondents "waived any argument that additional facts are needed to adjudicate this matter." *Id.* at 7.

### b.    Respondents Have Not Shown that Discovery is Needed

Next, FERC argues that the Respondents have not shown that they require discovery. *Id.* at 7–8. First, FERC argues that the Respondents actually possess a number of documents they claim the Commission has withheld. *Id.* at 7. Second, FERC alleges that the Respondents have not satisfactorily explained why they need additional testimony or what additional information they seek. *Id.* Third, FERC contends that the Respondents have failed to adequately identify specific documents that the Commission supposedly withheld. *Id.* at 8. Although the Respondents listed a series of Bates numbers, FERC argues that the Respondents do not show why these particular documents are relevant. *Id.* Finally, FERC asserts that the Respondents cannot obtain discovery of internal communications between Enforcement and the Commission during the investigation because such communications are "protected by the deliberative process, attorney work product, and attorney-client communication privileges." *Id.*

### c.    Investigative Files Are Confidential

FERC insists that the Respondents are not entitled to Enforcement's investigative materials because "Enforcement's investigations are confidential by law...to protect the integrity of the investigative process. *Id.* at 3 (citing 18 C.F.R. § 1b.9). FERC explains that in 2009, the Commission adopted a policy that requires Enforcement to "scrutinize materials it receives from sources other than the investigative subject(s) for materials that would be required to be disclosed under *Brady*." *Id.* at 3 n. 11. Under the policy, "[a]ny such materials or other information that are not known to be in the subject's possession shall be provided to the subject." *Id.* FERC states that it "long ago produced all documents obtained from any source that were arguably exculpatory pursuant to Commission policy." *Id.* This, FERC asserts, satisfies its obligations to produce documents from Enforcement's investigative file. *Id.* at 3–4.

### 4. Complex Track

FERC argues that even if the Court orders a trial in this case, the Court should not assign it to the complex track for three reasons. *FERC's Resp.* at 7. First, the case does not involve a large number of parties. *Id.* Second, the Respondents' alleged fraud does not involve complex issues. *Id.* Finally, the scope of discovery would be limited because the Commission has already collected the relevant evidence, and any discovery would be supplemental. *Id.*

## III. DISCUSSION

### A. Required Procedures under the FPA

The Court must determine what procedures govern its de novo review of the Commission's assessment orders under the FPA. The Court first analyzes the text of the statute and the Commission's past interpretations and practices in relation to the FPA.

### 1. Statutory Language

Before FERC may issue "an order assessing a civil penalty against any person," the FPA requires the Commission to "inform such person of his opportunity to elect" one of two procedural routes. 16 U.S.C. § 823b(d)(1). The default option (Option 1) is set forth in 16 U.S.C. § 823b(d)(2). Under Option 1:

> [The Commission] shall assess the penalty, by order, after a determination of violation has been made on the record after an opportunity for an agency hearing…before an administrative law judge…Such assessment order shall include the administrative law judge's findings and the basis for such assessment. Any person against whom a penalty is assessed under this paragraph may…institute an action in the United States court of appeals for the appropriate judicial circuit for judicial review of such order…The court shall have jurisdiction to enter a judgment affirming, modifying, or setting aside in whole or in [p]art, the order of [the Commission], or the court may remand the proceeding to [the Commission] for such further action as the court may direct.

16 U.S.C. § 823b(d)(2)(A)–(B).

In this case, the Respondents chose to proceed under 16 U.S.C. § 823b(d)(3) (Option 2). Under Option 2:

> [The Commission] shall promptly assess such penalty, by order[.]…If the civil penalty has not been paid within 60 calendar days…[the Commission] shall institute an action in the appropriate district court of the United States for an order affirming the assessment of the civil penalty. The court shall have authority to review de novo the law and the facts involved, and shall have jurisdiction to enter a judgment

enforcing, modifying, and enforcing as so modified, or setting aside in whole or in [p]art such assessment.

16 U.S.C. § 823b(d)(3)(A)–(B).

As an initial matter, Option 2 does not dictate the procedures the Commission should use to assess the civil penalties. The only statutory directive is promptness. There is nothing in the language of the statute that requires the Commission to provide the targeted parties any procedural protections, such as access to discovery, a hearing, or the ability to confront evidence. Thus, the procedures that the Respondents allege governed FERC's penalty assessment in this case—namely, inviting the Respondents to present evidence and submit written arguments, but prohibiting the Respondents from engaging in discovery—arose from FERC's own policies, and are not derived from the express language of the statute.

Similarly, the language of Option 2 does not specify what procedures should guide the district court's de novo review. Instead, the statute merely states, "[t]he court shall have authority to review de novo the law and the facts involved." 16 U.S.C. § 823b(d)(3)(B). The statute does not explicitly state whether the district court should order a full trial governed—both before and during trial—by the Federal Rules of Civil Procedure, or whether the district court should fashion procedural protections unique to this process and to the circumstances of the case before it.

FERC argues that the statute's use of the words "shall have the authority" signals that the Court has the power to conduct a review but that the Court does not need to perform any particular type of review. *FERC's Suppl. Resp.* at 22. The Court disagrees with this interpretation of "authority." The Court reads the phrase "shall

34

have the authority" as indicating Congress' intent to designate the district court—as opposed to the United States Court of Appeals—as the proper initial reviewing court under Option 2. At times, the United States Court of Appeals directly reviews administrative decisions and the process bypasses the district courts. Indeed, if the Respondents had selected Option 1 and proceeded to a hearing in front of an ALJ, they could have appealed any unsatisfactory decision to the Commission and, ultimately, to the United States Court of Appeals. In the context of § 823b(d)(3), however, Congress specifically determined that the district court should review FERC's order. That is, Congress authorized ("shall have the authority") the district court to review the order. However, the Court's interpretation still does not answer the question of what procedures should govern the Court's review. On that score, the statutory language remains ambiguous. *See Maxim Power*, 2016 U.S. Dist. LEXIS 107770, at *21.

## 2. FERC's Past Interpretations and Practices

Because the Court is unable to divine the applicable procedures from the text of the statute, the Court turns for insight to the Commission's past interpretations and practices. In 1988, FERC issued final rules that set forth procedures for assessing civil penalties under the FPA. In connection with those rules, FERC published an order that stated that when "district court procedures are followed, the assessment of civil penal[ties] by the Commission merely triggers the process leading to a de novo trial." *Procedures for the Assessment of Civil Penalties Under Section 31 of the Federal Power Act*, 53 Fed. Reg. 32035-01, 32038 (1988). Again in 1994, FERC

stated that the FPA requires "the opportunity for a hearing on the record before an Administrative Law Judge or a trial *de novo* in federal court[.]" *Consumers Power Co.*, 68 FERC 61077, 61380 (1994).

As FERC points out, however, the Commission has more recently referred to "de novo review" as opposed to a "trial de novo." *See Statement of Administrative Policy Regarding the Process for Assessing Civil Penalties*, 117 FERC 61317 (2006). Significantly, FERC's recent references to "de novo review" simply restate the statutory language and do not provide any insight into the procedures that should govern the Court's review. Thus, these later statements do not necessarily contradict the Commission's earlier, more specific statements indicating that the FPA requires the Court to hold a trial de novo.

Moreover, in 2007, FERC issued an order in a case involving the Natural Gas Policy Act (NGPA), another statute that FERC administers. *Energy Transfer Partners, L.P.*, 121 FERC 61282 (2007) (NGPA Order). The NGPA contains enforcement procedures that are nearly identical to Option 2 of the FPA. That is, once the target of the enforcement receives notice of the proposed penalty, the "Commission shall, by order, assess such penalty." 15 U.S.C. § 3414(b)(6)(E). If the target fails to pay the penalty within sixty days, "the court shall have authority to review de novo the law and the facts involved[.]" 15 U.S.C. § 3414(b)(6)(F).

FERC's 2007 order enforcing the NGPA often refers to "*de novo* review." Notably, however, the order also states that the party facing the penalty is entitled to a trial at the district court level: "Congress created an affirmative right for the

[party facing a penalty] to receive review of the Commission's assessment in a trial *de novo* in district court." NPGA Order ¶ 34. Later in the order, FERC again states that "the recipient of the penalty has an affirmative right to receive review of the Commission's assessment in a trial *de novo* in district court." *Id.* ¶ 77. Although the NGPA and the FPA are different statutes, FERC administers both, and the NGPA's enforcement procedures mirror the procedures available under Option 2 of the FPA.

In addition to its prior statements about the FPA, FERC's past practices under the FPA indicate that the Commission previously accepted that Option 2 required a trial de novo. In *MacDonald*, 862 F. Supp. 667, a party facing a penalty assessment under the FPA chose to proceed under Option 2. FERC issued an assessment order and brought an action in district court seeking to enforce its order. *Id.* at 669; *see Maxim Power*, 2016 U.S. Dist. LEXIS 107770, at *27. Unlike the present case, the parties in *MacDonald* did not dispute the procedures the district court should use to review the Commission's assessment orders. *MacDonald*, 862 F. Supp. at 669. Rather, the case proceeded an ordinary civil action: the Commission filed a complaint, the parties engaged in discovery, and the parties filed cross-motions for summary judgment.[5] *Id.*

In ruling on the motions for summary judgment, the district court in *MacDonald* described its task:

---

[5] The *MacDonald* decision does not state whether the parties engaged in discovery. However, in *Maxim Power*, the district court reviewed the docket entries in *MacDonald* and wrote that "[t]he docket indicates the parties engaged in discovery, including the taking of depositions and judicial management of discovery disputes, before filing cross-motions for summary judgment." 2016 U.S. Dist. LEXIS 107770, at *27. Indeed, the *Maxim Power* Court concluded that in *MacDonald*, "the parties engaged in discovery in advance of an anticipated trial," and the Court inferred that "the Federal Rules of Civil Procedure were followed as in an ordinary civil action." *Id.* at *28.

[Option 2 of the FPA] specifies that when FERC brings an action in the district court to enforce a civil penalty assessment, the court must make a de novo review of the assessment. Accordingly, I will give no deference to FERC's decision. Instead, I will make "a fresh, independent determination of 'the matter' at stake."

*Id.* at 672. The district court denied the motions for summary judgment and set the case for trial before the parties eventually settled. It is notable that the *MacDonald* court applied the Federal Rules of Civil Procedure to its de novo review of FERC's assessment order, and there is no indication that FERC objected.

FERC's past interpretations and practices provide some support for the Respondents' position that the FPA requires a trial de novo. However, these historical understandings and applications—although somewhat insightful—are not dispositive. First, the Court credits FERC's argument that the Commission's previous statements regarding "de novo trial" are not regulations themselves but merely dicta commentaries that are not binding on this Court. *FERC's Suppl. Resp.* at 32–33. Moreover, the Commission made the comments over two decades ago, and the Court accepts FERC's argument that "since the time the rules were promulgated, the Commission has added numerous procedures to its investigations that provide subjects with greater transparency, additional opportunities to respond to Enforcement's findings, and due process protections during the Order to Show Cause stage[.]" *Id.* at 33.

Furthermore, FERC's actions in *MacDonald* do not necessarily mean that the Commission interpreted the FPA to always require a trial de novo in accordance with the Federal Rules of Civil Procedure. Rather, FERC's practice in that case was

consistent with its position that the Court has "great latitude in determining how to conduct its review[.]" *Joint Rep.* at 5. Indeed, the Commission has recognized that, at times, a trial may be appropriate under the FPA. *Id.* FERC may have acquiesced to the trial procedures in *MacDonald* simply because the Commission concluded that a trial was appropriate under the circumstances of that case.

In any event, even if FERC assumed a particular legal position in a case, FERC is not forever bound to hew to the same legal positions in the future. The Respondents' argument would have the Court apply an unusual form of estoppel against FERC. Notwithstanding of the fact that the Court in *MacDonald* did not actually rule on the issue of whether "review de novo" under the FPA requires a trial, the Supreme Court has held that nonmutual offensive collateral estoppel "is not to be extended to the United States." *See United States v. Mendoza*, 464 U.S. 154, 158–60 (1984) (reasoning that asserting nonmutual collateral estoppel against the government would "thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue"). In other words, FERC's conduct in one case does not permit the Court to conclude definitively that the FPA requires a de novo trial, especially given that the Commission has more recently argued the opposite in a series of cases. *See Maxim Power*, 2016 U.S. Dist. LEXIS 107770; *City Power*, 2016 U.S. Dist. LEXIS 105421.

While FERC's views of the issue may provide guidance as to the appropriate construction of the statute, it is not the task before the Court to evaluate the accuracy or consistency of FERC's interpretation of this Court's authority under 16 U.S.C. §

823b(d)(3); rather, it is the Court's duty to determine what this Court's authority actually is under the law.

## B.     Nature of Review De Novo

Because neither the language of the statute nor FERC's past interpretations and practices provide clear guidance regarding the procedures that govern the Court's de novo review under the FPA, the Court turns next to the nature of de novo review more generally.  The Court explores whether Congress' decision to provide "review de novo" necessarily requires a trial in accordance with the Federal Rules of Civil Procedure or whether a district court has discretion to craft its own procedures short of a full trial.

In general, de novo review means that a "court should make an independent determination of the issues."  *United States v. First City Nat. Bank of Houston*, 386 U.S. 361, 368 (1967); *see also Doe*, 821 F.2d at 697–98 ("De novo means here, as it ordinarily does, a fresh, independent determination of 'the matter' at stake"); *MacDonald*, 862 F. Supp. at 672.  Although these pronouncements make clear that a court engaged in de novo review must determine the issues with a fresh eye, questions remain regarding the scope of material that should fall under its gaze and the extent of required process.  This case asks whether the Court may limit the scope of its de novo review to the administrative record compiled below, or whether the court must treat the matter as any other civil action subject to the Federal Rules.

To begin, the structure of the FPA suggests that the Court's de novo review is not limited to the administrative record alone.  The Court finds it significant that

Congress established two procedural choices under the FPA. Parties who elect Option 1 proceed to a hearing in front of an ALJ and may seek "judicial review" from the Court of Appeals in accordance with the APA, 5 U.S.C. §§ 701–06. 16 U.S.C. § 823b(d)(2)(B). Under Option 2, parties bypass a hearing in front of an ALJ and receive a prompt penalty assessment from the Commission. The Commission can then "institute an action in the appropriate district court" for "review de novo" of the Commission's assessment order. 16 U.S.C. § 823b(d)(3).

If the district court's de novo review in Option 2 was limited to the administrative record, it would be fulfilling essentially the same task as the appellate courts under Option 1—namely, "judicial review." Yet the district court's task under Option 2 is not "judicial review"; Option 2 plainly states that the district court is to provide "de novo" review. More generally, it strikes the Court that if Congress intended to establish a standard akin to "judicial review" for Option 2 as well as Option 1, Congress would have designated the Court of Appeals as the reviewing court in both instances. The Court can perceive no reason why Congress would designate two different courts to serve a nearly identical function within the same statute.

There are some instances in which Congress has specifically designated the district court to act in a purely appellate capacity. For example, Congress provided that a district court may act as the initial appellate court for bankruptcy appeals, and it used clear language establishing the district court's role. 28 U.S.C. § 158 ("The district courts of the United States shall have jurisdiction to hear appeals…from final

judgments, orders, and decrees…of bankruptcy judges"). In other words, if Congress intended to restrict the nature of the district court review to appellate review, it knew how to say so. By contrast, the statutory language in Option 2 calls for the Commission to "institute an action"—as opposed to an appeal—in the district court and tasks the district court with review "de novo." The Court thus concludes that its task under Option 2 is not limited to an appellate review and that the Court is therefore free to look beyond the administrative record in the performance of its de novo review. However, this conclusion still does not resolve what the term "review de novo" under Option 2 affirmatively requires. For insight, the Court turns to recent caselaw discussing the meaning of de novo review in the context of the FPA.

Two district courts, including one in this Circuit, recently held that de novo review under Option 2 of the FPA requires the district court to treat the matter as a standard civil action. *See Maxim Power Corp.*, 2016 U.S. Dist. LEXIS 107770; *City Power*, 2016 U.S. Dist. LEXIS 105421. The District of Massachusetts' decision in *Maxim Power* focused primarily on due process concerns:

> Option 2 would not be fair to parties facing a penalty if it failed to provide due process rights during FERC's penalty assessment and did not provide for due process rights at a later district court review. Congress cannot have intended for one of the procedural options to be so unappealing and unfair…Even assuming a party could be certain that FERC would grant what it believed to be procedural rights, under FERC's reading of the FPA, a penalized party still would not know what procedures a reviewing district court would provide before electing Option 2.

*Maxim Power*, 2016 U.S. Dist. LEXIS 107770, at *19–20.  In order to safeguard a penalized party's due process rights, the Court determined that de novo review under Option 2 of the FPA required a trial subject to the Federal Rules.  *Id.* at 39.

Similarly, in *City Power*, the District Court for the District of Columbia reasoned that the Federal Rules were the "logical procedures to govern" the district court's de novo review under Option 2.  *City Power*, 2016 U.S. Dist. LEXIS 105421, at *29.  The Court noted that a "clear expression" of congressional intent was necessary before departing from the Federal Rules and that there was no such clear expression with respect to the FPA.  *Id.* at *28.  The Court further explained:

> [T]he Court does not see why it should place special weight on the agency record or presume that City Power should not get discovery. Option 1 clearly envisions the development of a comprehensive record at the agency level and record-based review by a court of appeals.  But Option 2 does not mandate any particular agency procedures, and places judicial review in a district court, where factual development through discovery is the norm.

*Id.* at *29.  The Court determined that it would treat the case like a "normal civil action governed by the Federal Rules" but permitted FERC to file a motion for summary judgment right away to argue that the agency record already contained all of the relevant evidence.  *Id.* at *31.

This Court takes a somewhat different view.  As an initial matter, the Court recognizes that the term "de novo" appears in a host of statutory contexts beyond the FPA.  *See*, *e.g.*, 28 U.S.C. § 636 (permitting a district judge to "make a de novo determination" of a magistrate judge's proposed findings or recommendations"); 5 U.S.C. § 552a (district courts deciding Privacy Act claims brought against agencies

for failing to amend an individual's record "shall determine the matter de novo");

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (making de novo review the default standard of review of benefit claim denials under ERISA). The Court notes that the application of the "de novo" standard in these other contexts suggests that a district court may use its discretion to adjust the scope of its de novo review based in part on the proceedings that occurred below. To underline this point, the Court briefly analyzes the application of the "de novo" standard in three statutory contexts.[6]

Pursuant to 28 U.S.C. § 636, a district court may designate a magistrate judge to "conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations" of certain motions and applications for relief. 28 U.S.C. § 636(b)(1)(B). A party may file objections to the magistrate judge's proposed findings and recommendations, and the statute instructs the district court to "make a de novo determination" of the portions of the findings or recommendations relating to the objection. *Id.* The Supreme Court has made clear that a "de novo determination" in the context of § 636 does not require the district court to rehear the testimony that formed the basis of the magistrate's findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 674 (1980). However, if the district court reviews the magistrate's findings and recommendations and "finds there is a problem as to the credibility of a witness…or for other good reasons," the

---

[6]    Some statutes specifically require a court to conduct a de novo "trial." *See* 42 U.S.C. § 300e-9(d)(3); 5 U.S.C. § 7702(e)(3); 5 U.S.C. § 7703(c). As the FPA calls for "review de novo," the Court limits its comparative analysis to statutory schemes that likewise call for a de novo "review" or "determination."

court may choose to rehear certain testimony or take additional evidence "in the exercise of sound judicial discretion." *Id.* at 676 (quoting H.R. Rep. No. 94–1609, at 3–4). In other words, a district court performing a "de novo determination" has flexibility to adjust the scope of its review based on its assessment of the record compiled below.

The Privacy Act, 5 U.S.C. § 552a, provides another example. Under the Act, an individual may bring a civil action in federal district court to challenge an agency's determination not to amend an individual's record. § 552a(g)(1)(A). In such a case, "the court shall determine the matter de novo." § 552a(g)(2)(A). Then-Judge Ruth Bader Ginsburg, writing for the majority of the Court of Appeals for the District of Columbia Circuit, concluded that the district court's de novo inquiry "is not limited to or constricted by the administrative record[.]" *Doe¸* 821 F.2d at 698. Judge Ginsburg cited secondary authority for the proposition that a court "engaged in de novo review…may pursue whatever further inquiry it finds necessary or proper to the exercise of the court's independent judgment." *Id.* (quoting 5 B. Mezines, J. Stein, & J. Gruff, Administrative Law § 51.04 (rev. ed. 1985)). This again suggests that district courts have discretion to determine the scope of de novo review and may, depending on the circumstances, constrict the review to the administrative record or supplement the record with additional fact-finding.

The First Circuit's approach in ERISA cases further reinforces this view. In *Firestone Tire,* 489 U.S. 101, the Supreme Court established de novo review as the default standard of review of benefit claim denials under ERISA. *Id.* at 115. The

First Circuit subsequently held in *Orndorf v. Paul Revere Life Insurance Company*, 404 F.3d 510 (1st Cir. 2015), that "[t]he focus of the review under de novo review is [] the administrator's decision and must ordinarily be based on the administrative record." *Id.* at 519. The First Circuit reasoned that "[i]t would offend interests in finality and exhaustion of administrative procedures required by ERISA" to permit the claimant to present the district court with extra-administrative record evidence going to the substance of the administrator's decision. *Id.*

Yet the First Circuit's decision still left room for district judges to use their discretion to expand the scope of de novo review to include extra-administrative record evidence. The Court recognized that "there may be times when it is appropriate for courts to hear new evidence" but that "some very good reason is needed to overcome the strong presumption that the record on review is limited to the record before the administrator." *Id.* at 520 (quoting *Liston v. Unum Corp. Officer Severance Plan*, 330 F.3d 19, 23 (1st Cir. 2003)). Notably, the First Circuit pointed out that the claimant in *Orndorf* did not allege that the administrator denied him the opportunity to present evidence. *Id.* Rather, the claimant had "ample time to collect records and had two administrative appeals reviews of his claims[.]" *Id.* at 519. Although the First Circuit did not have cause to resolve the issue, *Orndorf* suggests that a district court may use its discretion to expand the scope of its de novo review when a party alleges that it did not have a satisfactory opportunity to present evidence to the administrator in an ERISA case.

In sum, courts tend to agree that the term "de novo" requires a district court to make a fresh, independent determination of a matter. However, there are no rigid parameters on the scope of the district court's review that apply across statutes. Instead, when tasked with performing de novo review, district courts appear to have discretion to adjust the scope of the de novo review based on the needs of the case. Accordingly, this Court is reluctant to make a grand pronouncement about the required scope of de novo review under § 823b(d)(3) in every case and instead concludes that it should assess the individualized circumstances of this case, paying particular attention to the details surrounding the administrative proceedings below, to determine whether it should allow for additional fact-finding.

In this case, the Respondents raise a number of concerns regarding the procedures that FERC employed during the penalty assessment stage. The Respondents assert that they were unable to seek discovery, to gain access to the results of FERC's investigations, or to question potential witnesses. *Resp'ts' Suppl. Br.* at 2–3, 7, 12. They assert that FERC deposed numerous entities and individuals but that the Respondents did not receive advanced notice of these depositions, nor were they allowed to attend the depositions, cross-examine the deponents, or review the deposition transcripts. *Id.* at 2. Further, the Respondents allege that based on the "parsimonious" portions of the documentary material that FERC permitted them to review, the Respondents identified numerous factual misrepresentations in Enforcement's conclusions. *Id.* at 4. The Respondents allege that FERC's petition "includes a number of scurrilous allegations," and that to protect their rights and

adequately respond to these accusations, the Respondents "must be able to conduct discovery and cross-examine witnesses as provided under the Federal Rules of Civil Procedure[.]" *Id.* at 14.

For purposes of this motion only, the Court accepts the Respondents' assertions regarding the proceedings at the agency level. Furthermore, the Court shares the Respondents' concerns that the Commission's procedures deprived the Respondents of an adequate opportunity to present their case and defend against Enforcement's accusations. Although FERC insists that the Respondents had an opportunity to submit evidence to the agency, it does not appear that FERC's procedures afforded the Respondents a full opportunity to obtain it. These procedural concerns are especially salient in this case because the Respondents' private interests are sizeable. The Commission's assessment orders imposed a $1,250,000 civil penalty against Dr. Silkman and a $7,500,000 civil penalty against CES. *FERC Pet.* ¶ 62. The assessment orders also required CES to disgorge $166,841.13 in unjust profits. *Id.* According to the Respondents, these penalties would bankrupt both Dr. Silkman and CES. *Resp'ts' Suppl. Br.* at 13. Moreover, the Respondents allege that the administrative energy program at issue—the DALRP—is arcane and confusing. The Court anticipates that a fuller evidentiary record with input from the Respondents will likely assist the Court's understanding of the program and aid the Court's de novo review.

The Court is therefore unwilling to constrict its de novo review to the existing administrative record compiled by the Commission. Rather, the Court concludes that

it is appropriate, given the particular circumstances of this case, to expand the scope of its de novo review and treat this case as an ordinary civil action governed by the Federal Rules. Applying the Federal Rules will address the procedural concerns described above and will provide a more complete factual record upon which to base the Court's de novo review. Indeed, once the Respondents have access to discovery, they "might be able to show that the factual landscape is meaningfully different from what FERC's [assessment orders] indicate[]." *City Power*, 2016 U.S. Dist. LEXIS 105421 at *30.

FERC correctly points out that "the extent of permissible discovery in an agency proceeding 'is primarily determined by the particular agency.'" *FERC's Resp.* at 36 (quoting *McClelland*, 606 F.2d at 1285). That is, an agency proceeding does not necessarily need to adhere to the Federal Rules, *id.*, and agency decisions regarding discovery are entitled to "extreme deference." *EchoStar Commc'ns Corp. v. FCC*, 292 F.3d 749, 756 (D.C. Cir. 2002) (quoting *Hi-Tech Furnace Sys., Inc. v. FCC*, 224 F.3d 781, 789 (D.C. Cir. 2000)).

It is important to note that although agency proceedings do not need to adhere strictly to the Federal Rules, an agencies' procedures must still accord with due process. *See McClelland*, 606 F.2d at 1286 ("[T]he agency is bound to ensure that its procedures meet due process requirements"); *see generally Mathews*, 424 U.S. at 322. Ultimately, however, this Court need not decide whether the procedures that FERC employed in this case violated the Respondents' due process rights because the Court may use its own discretion, based on a variety of factors, to determine whether to

expand the scope of its de novo review.  Here, the Court's discomfort with the agency's procedures, combined with the high stakes of the penalties and the potential complexity of the energy program at issue, cause the Court to expand the scope of its review and determine that the Federal Rules apply.

### C.    The Respondents Did Not Waive Rights to Discovery

FERC argues that the Respondents waived any rights to discovery because they did not raise the need for additional facts in front of the Commission.  Yet in their response to the Commission's orders to show cause, the Respondents complained to the Commission that "the FERC procedures have been fundamentally unfair and nontransparent.  Although the Commission authorized the Staff to disclose information obtained during the investigation, the Staff has refused even to identify whom it deposed, much less provide copies of the requested depositions or other documents it obtained."  *Resp'ts' Disc. Reply*, Attach. 1, *CES and Richard Silkman Resp. to Orders to Show Cause* at 5 (ECF 89).  Moreover, the Respondents submitted a sworn declaration that they repeatedly requested, and were denied, materials in the proceedings before the Commission.  *See Brann Decl.* ¶¶ 5–6, 19, 27, 30.  Based on this evidence, the Court concludes that the Respondents did notify the Commission of their need for more documents, and thus the Respondents have not waived their rights to discovery.

FERC also argues that the Respondents waived their right to discovery when they opted for a prompt penalty assessment from the Commission instead of a hearing in front of an ALJ.  Yet in the Court's view, there is no reason why "the fact that

discovery is available under Option 1 suggests that it is not available under Option 2." *City Power*, 2016 U.S. Dist. LEXIS 105421, at *30. (emphasis omitted).

## D.    Additional Discovery Disputes

FERC also asserts that the Respondents have not shown that discovery is warranted in this case. For instance, FERC alleges that the Respondents already possess many of the documents they seek to discover, that they have not explained why the information they seek is relevant, and that internal communications between Enforcement and the Commission are not discoverable. Finally, FERC argues that the Respondents are not entitled to FERC's investigative files because they are confidential.

These arguments do not alter the Court's holding that, in this case, the Federal Rules of Civil Procedure apply to the Court's de novo review of the Commission's assessment orders. The Court concludes that it can better address potential discovery disputes as they arise and tailor the discovery process accordingly.

## E.    Complex Track

Local Rule 16.1 reserves the complex track for "those cases that require special attention because of the number of parties, complexity of issues, scope of discovery, and/or other comparable factors. D. ME. LOC. R. 16.1(3). This case does not involve a large number of parties—there is one petitioner and two respondents. FERC argues that this is an ordinary fraud case that does not involve complex issues. By contrast, the Respondents argue that the DALRP—the underlying program in this case—was so convoluted and complicated that even the program participants did not understand

how it worked. With respect to the scope of complexity, FERC argues that it has already collected all the relevant evidence and any discovery would be supplemental. The Respondents contend that the case involves numerous witnesses and "reams of data and other documents."

The Court will assign this case to the complex track. The Court credits the Respondents' assertion that the issues relating to the DALRP may become convoluted. Moreover, FERC's claim that it has already collected all the relevant evidence is grounded in assumption that the Respondents are not entitled to discovery. The Court holds that the Respondents are entitled to discovery; hence, it remains to be seen whether FERC has collected all the relevant evidence. Finally, the Court predicts that unique discovery issues may arise given the distinctive procedural backdrop of this case. As such, the Court will avail itself of the flexibility that the complex track affords.

## IV. CONCLUSION

The Court GRANTS Competitive Energy Services LLC and Dr. Richard Silkman's request for assignment to the complex track (ECF No. 73). The Court will treat its de novo review of the Federal Energy Regulatory Commission's orders assessing civil penalties against Competitive Energy Services and Dr. Richard Silkman as an ordinary civil action subject to the Federal Rules of Civil Procedure. The Court will tailor discovery as needed to promote an efficient resolution to the case. The Court ORDERS the parties to develop a discovery plan for the Court's

approval that balances the Respondents' need for discovery with the goals of avoiding duplicative efforts.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 26th day of January, 2017