UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) |
| Petitioner, | ) ) |
| v. | ) 1:16-cv-00205-JAW ) |
| RICHARD SILKMAN, et al., | ) ) ) |
| Respondents. | ) |

**ORDER ON OBJECTION TO ORDER RE: DISCOVERY DISPUTES**

Respondents, an energy consulting firm and its managing member, object to a portion of the Magistrate Judge's September 8, 2017 Order on Discovery Issues. *Defs.' Partial Obj. to Disc. Order* (ECF No. 119) (*Resp'ts' Mot.*); *Order on Disc. Issues* (ECF No. 117) (*Order*). Specifically, the Respondents object to the denial of their request for documents related to Petitioner Federal Energy Regulatory Commission's (FERC) decision not to pursue enforcement action against certain other individuals or entities. *Resp'ts' Mot.* at 1; *Order* at ¶ 2. The Court concludes that the Respondents failed to demonstrate that the Magistrate Judge's discovery ruling denying discovery is either clearly erroneous or contrary to law.

**I. BACKGROUND**

    **A. Concise Factual Background[1]**

---

[1] A more detailed factual and procedural background of the case may be found in *Federal Energy Regulatory Commission v. Silkman*, 233 F. Supp. 3d. 201, 204-10 (D. Me. 2017).

### 1. The Parties

FERC is an administrative agency of the United States, organized and existing pursuant to the Federal Power Act, 16 U.S.C. § 791a *et seq.* (FPA). *FERC Pet.* ¶ 13. FERC's Office of Enforcement (Enforcement) "initiates and executes investigations of possible violations of the Commission's rules, orders, and regulations relating to energy market structures, activities, and participants. *Office of Enforcement*, FERC, https://www.ferc.gov/about/offices/oe.asp (last visited January 25, 2017). Based on its investigations, Enforcement may submit reports to the Commission recommending that the Commission institute administrative proceedings. *FERC's Disc. Resp.* at 4. Once the Commission authorizes an administrative proceeding, Enforcement's role shifts from investigator to litigator, and a "wall" goes up between the Commission and its Enforcement arm to prevent ex parte communication. *Id.*

ISO–NE is an independent, non-profit organization that works to ensure the day-to-day reliable operation of New England's bulk electric energy generation and transmission system by overseeing the fair administration of the region's wholesale energy markets. *FERC Pet.* ¶ 2. FERC regulates the markets that ISO–NE administers. *Id.*

Respondent Competitive Energy Services (CES) is a limited liability company organized under the laws of Maine with its principal place of business in Portland, Maine. *Id.* ¶ 15. It provides energy consulting and other services to clients throughout North America. *Id.* ¶ 35. Respondent Richard Silkman (Dr. Silkman) resides in Maine and is an employee and managing member of CES. *Id.* ¶ 14.

### 2. The Day-Ahead Load Response Program

The Day-Ahead Load Response Program (DALRP) is a program administered by ISO-NE that encourages large electricity users to reduce the amount of electricity they consume from the grid during periods of high or peak demand. *FERC Pet.* ¶ 3. It provides this encouragement in the form of payments to participants who reduce their energy consumption during peaks hours. The payments are arranged in advance between the participants and ISO-NE, with the participants submitting bids that ISO-NE may accept. *Id.* ¶ 4.

### 3. Dr. Silkman and CES' Alleged Fraud

FERC alleges that CES and Dr. Silkman defrauded ISO-NE through the consulting services it provided to Rumford Paper Company (Rumford). *Id.* ¶ 36. Specifically, CES and Dr. Silkman knew that, although Rumford was connected to the electrical grid, it typically used a large, relatively inexpensive on-site generator to meet the substantial majority of its electricity needs to operate the paper mill. *Id.* In the spring of 2007, Dr. Silkman approached Rumford and suggested that the paper mill enroll in the DALRP. *Id.* ¶ 37. Rumford enrolled in the DALRP with assistance from an Enrolling Participant, Constellation NewEnergy, Inc. *Id.* ¶ 46. An Enrolling Participant is a third-party that helps register participants in the DALRP and arranges for ISO–NE to receive load response and meter data from the participant. *Id.* Additionally, an Enrolling Participant serves as a middleman, receiving payments from ISO–NE and distributing the revenue to the participant. *Id.*

Dr. Silkman and another CES partner advised Rumford to reduce the amount of electricity the mill created with its generator during the initial five-day baseline calculation period and to purchase unusually large amounts of more expensive replacement electricity from the grid. *Id.* ¶ 42. Dr. Silkman understood that this otherwise uneconomic short-term purchase of grid electricity would artificially inflate Rumford's baseline. *Id.* Dr. Silkman also understood that by designing daily offers to ISO–NE that were almost guaranteed to be accepted, Rumford could maintain its inflated baseline indefinitely. *Id.* ¶ 44. Dr. Silkman told Rumford personnel that if those bids were accepted, Rumford would receive substantial payments under the DALRP by simply resuming routine operation of its generator without reducing its electricity consumption from the grid. *Id.* CES, including Dr. Silkman, then communicated daily with ISO–NE regarding Rumford's availability to provide approximately twenty megawatts of electricity reduction. *Id.* ¶ 45. This phantom reduction was roughly equal to the amount by which Rumford curtailed its electricity generation during the baseline period. *Id.* CES continued the scheme by making offers at a price that effectively guaranteed acceptance, thereby assuring that Rumford's baseline would remain unchanged. *Id.*

From July 2007 through February 2008, Rumford did not actually reduce electricity consumption below its normal levels. *Id.* Dr. Silkman and CES actively participated in the scheme and continually concealed Rumford's lack of demand reduction from ISO–NE and from Constellation NewEnergy, Inc. (Constellation), Rumford's Enrolling Participant. *Id.*

4

In January 2008, Dr. Silkman received a phone call and a letter from Constellation explaining its concern that certain program participants had artificially increased their electricity usage during their baseline periods and warned that an enrollee could be subject to sanctions if ISO–NE determined that the enrollee committed fraud to extract load response program payments. *Id.* ¶ 49. Despite these communications, Dr. Silkman, CES, and Rumford continued their involvement with the scheme. *Id.* During Rumford's participation in the DLARP, ISO–NE paid $3,336,964.43 for load response that it contends did not occur. *Id.* ¶ 51. Rumford, Constellation, and CES shared the ISO–NE payments. CES—and Dr. Silkman as a result of his employment and ownership—received $166,841.13, or five percent of the total payments. *Id.*

### 4. Investigation and Enforcement Action

On February 8, 2008, ISO–NE altered the DALRP program to guard against baseline inflation. *Id.* ¶ 50. After analysis of electricity usage data, ISO–NE suspected that Rumford had committed fraud and referred the behavior to FERC for possible enforcement action. *Id.*

Enforcement commenced an investigation of Dr. Silkman and CES in February 2008. *Id.* ¶ 52. During the investigation, Enforcement obtained and reviewed thousands of pages of documents, including emails, internal memoranda, and electricity consumption and load response offer data. *Id.* Enforcement also deposed Dr. Silkman and several third-party witnesses, including Rumford and Constellation employees. *Id.* Enforcement determined from its investigation that Dr. Silkman and

5

CES devised and implemented a scheme to inflate Rumford's DALRP baseline in violation of § 222 of the FPA and the Commission's Anti–Manipulation Rule. *Id.* ¶ 53.

Enforcement was unable to reach a settlement with either Dr. Silkman or CES and therefore issued letters notifying them of Enforcement's intent to seek action by the Commission. *Id.* ¶ 54. Dr. Silkman and CES submitted a joint eighty-three-page response to these letters. *Id.* Enforcement provided Dr. Silkman and CES's response to the Commission, along with a report detailing Enforcement's findings, and recommended that the Commission issue orders to show cause to CES and Dr. Silkman. *Id.*

In July 2012, the Commission agreed to issue orders to show cause to Dr. Silkman and CES, and the Respondents submitted a joint answer in September 2012. *Id.* ¶ 55. In August 2013, the Commission issued orders assessing civil penalties against CES and Dr. Silkman, finding that the Respondents violated FPA § 222 and the Commission's Anti–Manipulation Rule by engaging in a scheme to inflate, and then by maintaining, a fraudulent baseline in order to receive payments for load response they never intended to provide or actually provided. *Id.* ¶¶ 60, 66–69. The Commission issued assessment orders in accordance with Enforcement's recommendations. *Id.* ¶ 62. Dr. Silkman and CES failed to pay their penalties within sixty days; therefore, pursuant to § 823b(d)(3)(B), the Commission filed a petition with this Court for an order affirming the assessment of the civil penalties. *Id.* ¶ 12.

### B. Recent Procedural Background

On August 1, 2017, the Magistrate Judge held a telephone conference to address several discovery issues. *Min. Entry* (ECF No. 112); *Order* at 1. On September 8, 2017, the Magistrate Judge issued an order on these issues, reiterating prior rulings with respect to some and addressing for the first time others that he had previously taken under advisement. *Order* at 1. Respondents filed their partial objection to the order on September 22, 2017. The only aspect of the multi-part order that the Respondents challenge is the denial of their request for documents regarding Petitioner's decision not to pursue enforcement action against certain other individuals or entities. *Resp'ts' Mot.* at 1. The Petitioners responded on October 6, 2017. *Pet'r's Resp. to Resp'ts' Partial Obj. to Disc. Order* (ECF No. 123) (*Pet'r's Opp'n*).

Of his denial of the discovery request, the Magistrate Judge wrote, "[a]s explained on the record, the information is not relevant to Plaintiff's action against Defendants." *Order* at 1. The transcript of the telephone conference illuminates the Magistrate Judge's reasoning. *See Tr. of Proceedings* 36:22-38:15, 39:3-9 (ECF No. 118) (*Tr.*). The Magistrate Judge, pointing to the absence of authority to the contrary, stated:

> "as a general rule, . . . information relating to . . . other investigations and the reasons why, either through consultation with counsel or otherwise, there was a decision by some authority that has . . . the ability to enforce regulations or laws, the decisions whether to proceed or not proceed are not necessarily discoverable in another case . . . unless there's going to be some affirmative use of it."

*Tr.* 37:3-14. He gave the Respondents the opportunity to provide legal authority for him to compel production by the Petitioner. *Tr.* 37:25-38:7. He further expressed his

7

belief that the documents Respondents seek contain internal thought processes and perhaps privileged communications. *Tr.* at 38:9-15, 39:3-9 ("I don't believe that there'd be anything there that would not be privileged . . . I just see those as the internal thought processes and maybe communications . . . with counsel . . .").

## II.     LEGAL STANDARD

The legal standard for evaluating an objection to a magistrate judge's decision on a non-dispositive matter, such as this discovery dispute, is whether the order is "clearly erroneous or contrary to law." 28 U.S.C. § 636; FED. R. CIV. P. 72(a). The "clearly erroneous" standard means that this Court "must accept both the trier's findings of fact and conclusions drawn therefrom unless, after scrutinizing the entire record, [it forms] a strong, unyielding belief that a mistake has been made." *Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 4 (1st Cir. 1999) (internal quotation and citation omitted). When review of a non-dispositive motion "turns on a pure question of law, that review is plenary under the 'contrary to law' branch of the Rule 72(a) standard." *PowerShare, Inc. v. Syntel, Inc.*, 597 F.3d 10, 15 (1st Cir. 2010). That is to say that the review is equivalent to de novo review. *Id.* "Mixed questions of law and fact invok[e] a sliding standard of review . . . . The more fact[-]intensive the question, the more deferential the level of review (though never more deferential than the 'clear error' standard); the more law intensive the question, the less deferential the level of review." *In re IDC Clambakes, Inc.*, 727 F.3d 58, 64 (1st Cir. 2013) (internal quotation and citation omitted).

## III. THE PARTIES' POSITIONS

### A. Respondents' Position

In support of their position that they are entitled to documents regarding FERC's decisions not to pursue enforcement actions against other persons and entities, Respondents compare their actions pertaining to Rumford's participation in the Day Ahead Load Response Program to certain actions of Constellation and other DALRP participants. *Resp'ts' Mot.* at 3-5. Respondents view Constellation as being more directly responsible for the violations arising out of Rumford's participation, and they see other DALRP participants as having undertaken substantially comparable conduct. *Id.* Respondents argue that documents relating to these arguably similarly situated entities would allow them to better understand how and why FERC decided to investigate and ultimately take action against them.

More specifically, Respondents have an interest in FERC's decision-making with respect to Constellation and why it closed its investigation into Constellation. *Id.* at 4. Respondents suggest that Constellation is more directly responsible for the activity that led to enforcement activity and that "[i]f FERC had legitimate reasons for dropping its investigation of Constellation, those reasons should apply with equal force to Defendants . . . ." *Id.* They cite the central role of Constellation as the Enrolling Participant for Rumford, characterizing it as "the only legally authorized entity overseeing and supervising Rumford's participation in the program." *Id.* at 3. Respondents speculate that documents related to FERC's decision not to pursue enforcement action against Constellation might contain facts that "might be relevant

9

to why [FERC] should have dropped the case against [Respondents]." *Tr.* at 12:23-13:4, 28:3-6, 28:18-21 ("So the question is, what [were] the facts that were interesting or different about Constellation that let them get a free pass in this thing?").

Beyond their particular focus on Constellation, Respondents make the broader argument that "the conduct alleged in this case is equally applicable to every other participant in the [DALRP]." *Resp'ts' Mot.* at 4-5. Specifically Respondents assert that a flaw in the Program, which ISO-NE identified, applied equally to all participants. *Id.* This flaw led to daily bids always being submitted for the minimum price; daily bids always clearing because the minimum price was less than the market price; and the resulting baselines remaining "static." *Id.* For these reasons, Respondents seek documents pertaining to any FERC decision(s) not to pursue enforcement action against any of these other DALRP participants. The Respondents contend this information is important to their defense.

### B. Petitioner's Position

#### 1. Documents and Information Sought are Privileged

FERC asserts that the information Respondents seek is protected by the attorney-client privilege, law enforcement privilege, deliberative process privilege, investigative privilege, prosecutorial discretion, and work product doctrine. *Pet'r's Opp'n* at 5, 9, 9 n.13; *Tr.* 21:7-11; *Pet'r's Opp'n* Attach. 7 *Pet'r's Responses and Objections to Resp'ts' First Request for Produc. of Docs.* at 26. FERC states that it has "produced all nonprivileged documents that [it] obtained at any point from Constellation during investigation that bear on Rumford or CES or Silkman's conduct

10

in the DALRP." *Tr.* 18:16-19. These include all communications between FERC and Constellation in FERC's possession and all information Constellation provided to FERC during the investigation.[2] *Pet'r's Opp'n* at 9. FERC takes the position that any other documents pertaining to its decision not to pursue enforcement action against FERC "would be privileged and not subject to discovery." *Tr.* 19:1-4. FERC cites *EEOC v. Chicago Miniature Lamp Works*, 526 F. Supp. 974, 975 (N.D. Ill. 1981), *Gomez v. City of Nashua, N.H.*, 126 F.R.D. 432, 435 (D.N.H. 1989), and *EEOC v. Caterpillar*, 409 F. 3d 831, 833 (7th Cir. 2005) for the proposition that internal processes and communications pertaining to decisions to pursue or not to pursue administrative investigations and enforcement actions are not subject to scrutiny by parties against whom enforcement action is ultimately taken. *Tr.* 19:23-20:2. FERC says that neither it nor Respondents has identified any contrary authority. *Id.* 20:2-3.

While FERC has not conducted a search for all documents that would be responsive to the discovery request at issue, it claims that "never has there been an investigation that has not generated some internal work product." FERC characterizes itself as "confident in saying that there are some documents exchanged among attorneys who are part of the investigation team as they were looking at Constellation, and . . . those almost certainly would include a discussion as to whether to continue or whether to stop that investigation." *Tr.* 20:21-21:1. Indeed, FERC

---

[2] FERC points out that Respondents have additional information relating to Constellation in the form of nonprivileged documents responsive to a document subpoena they served on Constellation, and the deposition of a Constellation employee. *Pet'r's Opp'n* at 9.

11

asserts that "any information about anybody we may have considered investigating, whether we—why we chose not to investigate them, anything of that nature would we believe be unquestionably privileged." *Tr.* 22:17-20. FERC views as privileged not only the documents, but also the information contained in the documents.[3] "[I]t's an absolutely unbroken line, the decisions as to why you do or don't prosecute are not something that need to be shared with the outside world. And so what he's asking us to do is list exactly our mental impressions, and the cases shield us from having to do that." *Tr.* 30:17-22; *see also id.* 19:18-20.

### 2. Respondents Waived Any Claims with respect to Entities other than Constellation

FERC argues that Respondents waived any valid request they might have once had for documents related to entities other than Constellation because (1) it is not among the issues they identified in their letter requesting the discovery conference, and (2) Respondents affirmatively stated at the telephone conference that the parties' disagreement regarding the scope of permissible discovery was limited to Constellation. *Pet'r's Opp'n* at 4.

### 3. Respondents are not Similarly Situated to Constellation

FERC also disputes Respondents' suggestion that they are similarly situated to Constellation. It describes CES and Dr. Silkman's role in Rumford's DALRP participation, "Respondents conceived of the scheme to enroll Rumford, to set its

---

[3] *See Tr.* 28:7-29:11. In rejecting a suggestion by counsel for Respondents that, as an alternative to producing the documents at issue, FERC could respond to an interrogatory about the reasons it did not take enforcement action against Constellation, FERC responded, "What [counsel for Respondents] is asking us to do is waive privilege."

12

baseline fraudulently, and to submit daily offers to take advantage of the fraudulent baseline. Respondents then worked with Rumford to take the steps necessary to implement their plan, including actually devising and submitting the daily offers to ISO-NE. It is undisputed that Constellation did none of this." *Pet'r's Opp'n* at 7 (citation omitted).

In contrast, FERC describes Constellation as having "served an administrative role, transmitting registration information to ISO-NE, installing a meter, establishing the software system Respondents and Rumford used to transmit DALRP offers to ISO-NE, and distributing DALRP payments from ISO-NE to Rumford and Respondents." *Pet'r's Opp'n* at 8. FERC also asserts that there is no evidence that Respondents informed Constellation about the allegedly fraudulent manner in which Rumford's baseline was set. *Id.*

These differences in roles vis-à-vis Rumford's DALRP participation undermine Respondents' argument that FERC's reasons for not continuing to investigate and/or take enforcement action against Constellation "should apply with equal force to Respondents," FERC argues. *Pet'r's Opp'n* at 8 (quoting *Resp'ts' Mot.* at 4)).

They also argue that, even if Respondents were similarly situated to Constellation, this would not be relevant unless there were evidence of discriminatory intent and effect of FERC's decision not to continue its investigation of Constellation. *Pet'r's Opp'n* at 6 n.9.

13

### 4. Conduct of Other Market Participants is not Relevant

FERC briefly stated the position that its decision as to whether to investigate and/or to close an investigation into some other entity is not relevant to the instant case. *Tr.* 19:23-25; *Pet'r's Opp'n* at 5.

FERC disagrees with Respondents' argument that characteristics of the DALRP somehow make the conduct of other participants relevant to this case. *Pet'r's Opp'n* at 5. FERC disputes the relevance of the flaw that Respondents allege existed in the DALRP that purportedly allowed every participant to freeze their baselines by placing low bids, which cleared every day. FERC maintains that freezing Rumford's baseline was merely how Respondents and Rumford perpetuated their fraud; it was by fraudulently inflating their baseline during the baseline measurement period that they committed the fraud in the first place. *Id.* FERC observes that Respondents do not allege that anyone else other than Lincoln Paper and Tissue Co. (Lincoln) fraudulently inflated their baseline in this way, and it argues that this fact renders meritless any attempt to analogize themselves to anyone other than Lincoln and moots their argument to the extent it turns on the DALRP's alleged flaw. *Id.* FERC also points out that Respondents offer no evidence suggesting that FERC's reason(s) for deciding to terminate its investigation of Constellation is relevant. *Id.* at 6.

## IV. DISCUSSION

### A. Relevance and Proportionality

In general, the scope of discovery is limited to

> any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of

> the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

FED. R. CIV. P. 26(b)(1). The advisory committee notes regarding the 2015 amendments to Rule 26(b) state that a "party claiming that a request is important to resolve the issues should be able to explain the ways in which the underlying information bears on the issues as the party understands them." *Id.* advisory committee's note to 2015 amendment. At the same time, a "party claiming undue burden or expense ordinarily has far better information—perhaps the only information—with respect to that part of the determination." *Id.*

In addition, the 2015 amendments to the Federal Rules of Civil Procedure moved the proportionality factors in Rule 26 to a place of greater prominence in the text. *See id.* In his 2015 Year-End Report on the Federal Judiciary, Chief Justice Roberts characterized this change as "crystaliz[ing] the concept of reasonable limits on discovery through increased reliance on the common-sense concept of proportionality." JOHN ROBERTS, 2015 YEAR-END REPORT ON THE FEDERAL JUDICIARY (Dec. 31, 2015), at 6, available at http://www.supremecourt.gov/publicinfo/year-end/2015year-endreport.pdf. "The key here is careful and realistic assessment of actual need." *Id.* at 7. Reviewing of assertions of relevance in discovery "involves drawing lines, especially when targeted at logical inferences several times removed from the dispositive issue at hand." *Tyree v. Foxx*, 835 F.3d 35, 42 (1st Cir. 2016).

Here, Respondents assert relevance without adequately "explain[ing] the ways in which the underlying information bears on the issues as the party understands

15

them." FED. R. CIV. P. 26 advisory committee's note to 2015 amendment. They fail to develop any substantial connection between their defense and the information they suspect they might glean in the documents at issue. While Respondents make clear that they view their conduct as being no more culpable—and/or less so—than that of Constellation or other DALPR participants, even if true, it is not clear how FERC's thought processes with respect to decisions not to take enforcement action against supposedly equally or more culpable entities would relate in any cognizable way to CES and Dr. Silkman's defense. Respondents suggested to the Magistrate Judge that if FERC revealed its reason(s) for not pursuing enforcement action against Constellation, these reason(s) might also apply to Respondents. *Tr.* 12:23-13:4. But the Court is not convinced the agency's enforcement decisions against a third party would be relevant to its enforcement decision against the Respondents.

Even assuming FERC has this information, Respondents do not address how the Court might properly review FERC's decisions not to take enforcement action. *See Baltimore Gas & Elec. Co. v. FERC*, 252 F.3d 456 (D.C. Cir. 2001); *Friends of Cowlitz v. FERC*, 253 F.3d 1161 (9th Cir. 2001); *see generally Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985) (The Supreme Court "has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion. This recognition of the existence of discretion is attributable in no small part to the general unsuitability for judicial review of agency decisions to refuse enforcement"); *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007).

### 1. Documents Pertaining to Constellation

In part because Respondents have done little to meet their burden of demonstrating how the requested information bears on the issues in this case, the Court is skeptical as to how FERC's thought-processes with respect to any other entity could bear on the ultimate question of this litigation: whether Respondents committed the violations alleged and must shoulder the penalties assessed. FERC has already furnished substantial amounts of discovery arising out of its investigation of Constellation, *Tr.* 18:10-19 (discovery produced includes "all nonprivileged documents that [FERC] obtained at any point from Constellation during investigation that bear on Rumford or CES or Silkman's conduct in the DALRP"); *id.* 21:15-22, and Respondents have served a request directly with Constellation for documents. *Id.* 19:4-9. Assuming arguendo that documents pertaining to the decision to close the FERC investigation of Constellation—given its role in Rumford's DALRP participation—are potentially relevant to the issues in this case, the Court turns to whether discovery is justified in light of the burden on FERC.

### 2. Documents Pertaining to Entities Other Than Constellation

Before addressing discovery about Constellation, the Court addresses Respondents' claim that its right to discovery extends to third parties beyond Constellation. The Court readily concludes that the Respondents' request for documents pertaining to FERC's non-enforcement with respect to other entities—DALRP participants who had nothing to do with Rumford's participation—is beyond the bounds of proportionality. Respondents seek documents pertaining to decisions

not to take action against every other participant in the DALRP. They assert that such information is "relevant to the defense that a flawed program, and not [their own wrongdoing], is the real culprit in this matter." *Resp'ts' Mot.* at 5. Respondents fail to persuade the Court that such documents—if they even exist—would be relevant to Respondents' efforts to defend themselves against the penalties levied against them for their own alleged violations. Respondents are able to develop their theory about a flaw in the DALRP without knowing the reasoning behind the decisions that FERC may or may not have made not to pursue enforcement action against a range of entities that includes every participant in the Program. *Id.* at 4-5. Furthermore, Respondents do not claim that any of these other entities had a direct and substantial nexus to Rumford's participation the way that Constellation did. For these reasons, the Court finds that Respondents' request for documents relating to entities other than Constellation clearly fall outside the scope of discovery.

### B. Privilege

While Respondents place much weight on the relevance rationale mentioned in the Magistrate Judge's order, *see, e.g. Resp'ts' Mot.* at 4 ("Suffice it to say, FERC's decision to drop its investigation of Constellation is quite relevant to the *defense* in this matter, and the Magistrate Judge's conclusion otherwise is clear error." (emphasis in original)), the Magistrate Judge did not base his order solely on relevance, but also on privilege. Respondents fail to cite any caselaw contradicting the Magistrate Judge's interpretation of the law of privilege as it applies here. Indeed, they make no mention at all of privilege issues in their motion, instead

18

focusing exclusively on relevance. *See id.* at 1 ("Defendants challenge the Magistrate Judge's conclusion that 'such information' is not relevant.' Defendants do not object to the remainder of the Order on Discovery Issues.") Even if Respondents are correct about relevance and even if the Court were to agree, that alone would not entitle them to the relief they seek. *See* FED. R. CIV. P. 26(b).

The Court agrees with the Magistrate Judge that any such documents would likely be covered by the attorney-client privilege and/or the work product doctrine. Federal Rule of Civil Procedure 26(b)(5)(A)(ii) requires a party asserting a privilege to "describe the nature of the documents . . . not produced or disclosed . . . in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." *See Rowe v. Liberty Mutual Group, Inc.*, 639 Fed. Appx. 654, 657-58 (1st Cir. 2016); *In re Keeper of Record (Grand Jury Subpoena Addressed to XYZ Corp.*, 348 F.3d 16, 22 (1st Cir. 2003) ("the party who invokes the privilege bears the burden of establishing that it applies to the communications at issue"). Similarly, Federal Rule of Civil Procedure 34(b)(2)(C) requires that, in its objection, "must state whether any responsive documents are being withheld . . . ."

Here, FERC asserted that the information Respondents seek is protected by multiple privileges: attorney-client privilege, law enforcement privilege, deliberative process privilege, investigative privilege, prosecutorial discretion, and work product doctrine. *Pet'r's Opp'n* at 5, 9, 9 n.13. On their face, many, if not all, of these privileges that FERC asserts would appear to apply to its decision about whether to proceed against Constellation. To require FERC to search through its documents, to find

those documents potentially related to Constellation, to identify which privileges apply to which document, and (assuming the Respondents do not agree), to require judicial intervention into the validity of FERC's privilege assertions for each document would devolve this discovery dispute into a Freedom of Information Act case, which are notoriously dense and characterized by delay.

Rule 26(b)'s new emphasis on proportionality resolves the discovery dispute. If relevant, FERC's decision not to proceed against Constellation is marginally so. By contrast, the load on FERC to search out, categorize, and assert privileges to all potentially relevant documents is manifestly burdensome. On balance, the Court concludes that the Respondents failed to demonstrate their entitlement to the discovery of the disputed documents under Rule 26(b). This is especially true since the burden on the Respondents is to demonstrate that the Magistrate Judge's ruling is clearly erroneous or contrary to law.

## V. CONCLUSION

The Court DENIES Respondents' Partial Objection to Discovery Order (ECF No. 119).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 26th day of December, 2017